# United States Court of Appeals
## For the First Circuit

No. 13-1147

KEVIN HENSLEY,

Petitioner, Appellant,

v.

GARY RODEN,
Superintendent, MCI Norfolk,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Howard, Selya, and Thompson,
Circuit Judges.

Stewart T. Graham, Jr., with whom Graham & Graham was on
brief, for appellant.
Jennifer L. Sullivan, Assistant Attorney General, with whom
Martha Coakley, Attorney General, was on brief, for appellee.

June 20, 2014

THOMPSON, Circuit Judge. Kevin Hensley ("Hensley") was convicted in Massachusetts state court of first degree murder after killing his estranged wife, Nancy Hensley ("Nancy"). Hensley appealed and the Massachusetts Supreme Judicial Court ("SJC") affirmed. Hensley turned to the federal courts. Alleging violations of his Sixth Amendment rights to confrontation and effective assistance of counsel, he sought a writ of habeas corpus in United States District Court. Unconvinced, the district court denied the petition. After due consideration, we affirm.

## I. BACKGROUND

When we consider a state conviction on habeas review, we presume the state court's factual findings to be correct. See Abram v. Gerry, 672 F.3d 45, 46 (1st Cir. 2012). As a result, the below facts are derived from the SJC decision, see Commonwealth v. Hensley, 913 N.E.2d 339 (Mass. 2009), and the district court's decision, which itself drew from the SJC decision, see Hensley v. Roden, 2013 WL 22081 (D. Mass. 2013).

## A. The Crime

Hensley and Nancy were married in 1979 and over the years they had four children together. By January 2002, the marriage was in trouble. The pair argued about whether Nancy was spending enough time at home or whether she was spending too much time at a local gym, possibly in the company of men. Hensley decided to investigate the latter possibility by donning a fake beard and

-2-

following Nancy to the gym. Though he saw no sign of infidelity on Nancy's part, Hensley saw her speak with other men and he confronted her.

Shortly thereafter, on January 9, 2002, Nancy filed for divorce and obtained a temporary abuse prevention order against Hensley. The order required Hensley to leave the family's home, which was located at 198 Byron Street in East Boston. He moved to his sister's house in nearby Winthrop. As per the order, Nancy retained custody of the children, whom Hensley was prohibited from contacting pending further hearing.

On January 16 (the scheduled hearing date), the parties entered into an agreement. The order, which was entered as a temporary order in the divorce proceeding, provided that apart from prearranged visitation with the children, Hensley would stay away from the family's home. Hensley would have use of the couple's 1988 Plymouth Horizon automobile and Nancy would use their 2000 Buick LeSabre. They agreed that the children would remain in Nancy's care.

Not happy with the turn his life had taken, Hensley became despondent. According to his family, friends, and work supervisor, Hensley appeared depressed and distraught over the break-up of his family. He separately confided in two friends that if he lost custody of his children, he would kill Nancy and then himself.

On January 22, Nancy filed a complaint for contempt in family court, which alleged that Hensley was not complying with the agreement they had entered into. A few days later, Hensley was spotted by one of his neighbors jumping over a fence that surrounded an empty lot that stood opposite his home at 198 Byron Street. The neighbor reported this to Nancy. Hensley told a friend that he had been attempting to see his children and that Nancy had seen him and now she would try to take out another restraining order against him.

A little over a week later, on January 31, Hensley reported at 6:30 a.m. to his job at the Boston transportation department. Around 8:00 a.m., Hensley informed his supervisor that he was not "feeling right" and asked if he could use some vacation time to head home. Hensley then went to his sister's house where he stayed briefly before proceeding to 198 Byron Street. Hensley parked his vehicle around the corner (and out of view) from the house. He was next seen leaving the house around 11:45 a.m. He left in Nancy's Buick LeSabre automobile.

That afternoon Hensley's oldest daughter returned from school. The daughter, upon heading down to the basement to get something to drink, found her mother's dead body. Nancy's body was under her bedroom comforter; a blue necktie was tied tightly around her neck. She had blood on her face and hands, and her left eye was swollen. Nancy was wearing one sock and the other was in the

-4-

kitchen with what appeared to be a bloodstain.  There was no sign of forced entry.  Hensley's daughter called 911.

Meanwhile, Hensley drove Nancy's car to a ski resort in New Hampshire.  Hensley parked the car and ran a dryer vent hose from the exhaust pipe into the car in an attempt to asphyxiate himself.  He was thwarted when New Hampshire police officers and emergency personnel pulled Hensley from the vehicle around 9:00 p.m. and carried him to a nearby hospital.  New Hampshire state police quickly learned that Hensley was the suspect in a homicide back in Massachusetts.  Hensley was held on an involuntary emergency hospitalization based on his suicide attempt, which according to Hensley also included ingesting a bottle of sleeping pills.

At 1:11 a.m., New Hampshire state police questioned a Mirandized Hensley about Nancy's death.  He admitted going to the house, explaining that he wanted to get the Buick LeSabre automobile and kill himself.  When asked whether he went inside the house, Hensley said "I think I did."  Later in the interview he changed his response to: "I don't remember, it's all a blur, I just want to die."  Hensley also claimed not to remember whether he saw Nancy.  He admitted having keys to both the house and the automobile.  Around 3:30 a.m., New Hampshire police learned that a warrant had issued in Massachusetts for Hensley's arrest.  Hensley was then transported to jail.

-5-

## B. The Trial and Conviction

Hensley was indicted and tried for murder in the first degree based on alternative theories of deliberate premeditation and extreme atrocity or cruelty. Although Hensley did not take the stand, his defense was clear; he claimed mental impairment. In essence, defense counsel attempted to show that Hensley was incapable of forming the mental state required for first degree murder under either of the charged theories. A variety of witnesses testified on this point. Hensley's sister testified that Hensley had always been a wonderful man and a doting and involved father. After he was served with the initial abuse prevention order though, Hensley became a different person. According to Hensley's sister, he "basically fell apart," alternating between being depressed, hysterical, incoherent, and despondent. Hensley's daughter painted a similar picture, describing her father as having a "nervous breakdown" and not wanting to live anymore. Hensley's supervisor echoed similar sentiments. His friends testified that a barely functioning Hensley "looked like a zombie."

Testifying at trial, as a witness for the state, was Dr. Mark Flomenbaum, the chief medical examiner in Massachusetts at the time. Dr. Flomenbaum, who did not perform Nancy's autopsy, was called to take the stand because Dr. William Zane, the medical examiner who had performed the autopsy, was not available. Dr. Flomenbaum, after speaking to his credentials and explaining the

-6-

autopsy process in general, turned to Nancy's autopsy. He explained that he had reviewed the autopsy report, supporting materials, and photographs. Dr. Flomenbaum went on to opine that the cause of Nancy's death was "ligature strangulation," the mechanism being "blood starvation to the brain." He also testified regarding some of Dr. Zane's findings, including the length of the struggle, which was put at two to ten minutes, and the nature of the struggle, e.g., the fact that it appeared that the abrasions on Nancy's neck were caused by her trying to pull the ligature off during strangulation. The autopsy report itself was not admitted into evidence; however, Dr. Flomenbaum had the report with him on the witness stand to refer to as needed.

Following closing arguments, during which defense counsel conceded that Hensley killed Nancy but emphasized that he could not have formed the mental state required for a first degree murder conviction, the case went to the jury. On July 14, 2002, Hensley was found guilty of first degree murder under both the theory of deliberate premeditation and extreme atrocity or cruelty. He was sentenced to life in prison.

## C. The State Court Appeals

Hensley appealed his conviction to the SJC and filed a motion for a new trial in Massachusetts Superior Court based on ineffective assistance of counsel. His motion was denied; he appealed that as well. The SJC consolidated the two appeals and it

issued a decision on September 15, 2009. In it, the court rejected Hensley's myriad challenges, affirming his conviction and the denial of the motion for a new trial. We need not recount all of Hensley's claims, or the SJC's conclusions, as only two are relevant to this appeal.

The first was Hensley's claim that the trial court violated his Sixth Amendment right to confrontation when it admitted the testimony of Dr. Flomenbaum, who was not the medical examiner who performed Nancy's autopsy. The SJC was not persuaded. It found that Dr. Flomenbaum's opinion as to Nancy's cause of death was admissible because the doctor opined, as an expert, based on information properly and typically relied on by experts, and was subject to cross-examination. As for Dr. Flomenbaum's testimony regarding Dr. Zane's specific findings contained in the autopsy report (on which Dr. Flomenbaum based his cause-of-death opinion), the SJC concluded that "such testimony may not have been admissible at that point in the trial" since Dr. Flomenbaum was not the one who prepared the autopsy report. However, any such error was harmless, said the SJC, since the cause of death was not contested at trial. And, according to the SJC, to the extent the testimony was contested at trial, such testimony went to whether Hensley was guilty under the theory of extreme atrocity or cruelty, e.g., the testimony relating to the nature and extent of the struggle. Therefore, the SJC concluded, because there was "more than

-8-

sufficient evidence" to support Hensley's conviction under the deliberate premeditation theory, it did not need to consider whether any error in admitting Dr. Flomenbaum's testimony affected the jury's verdict under the theory of extreme atrocity or cruelty.

The second argument made by Hensley, relevant to this appeal, related to the performance of his trial counsel. Hensley contended that counsel's failure to present expert testimony and medical records pertinent to his mental impairment, and its effect on his capacity, constituted ineffective assistance.

The expert Hensley was referring to was David Rosmarin, M.D., a forensic psychiatrist whom Hensley's counsel had retained and consulted. Dr. Rosmarin evaluated Hensley and was prepared to testify at trial; however, defense counsel never called him. In support of his appeals, Hensley had Dr. Rosmarin pen a written report of his findings. Hensley pointed out that in it, Dr. Rosmarin had made some favorable findings, namely that mental impairment and dissociative symptoms precluded Hensley from "form[ing] the intent to kill or inflict grievous bodily harm." However, the SJC noted that the report was not all advantageous. The report also contained damaging statements about Hensley's level of criminal responsibility, as well as a gruesome description of the murder, which included references to Hensley being angry and blaming Nancy for his suicidal designs. Moreover, the SJC found it significant that this was not a case in which defense counsel had

failed to investigate a mental impairment defense.  Rather, counsel had thoroughly investigated (and ultimately presented) a mental impairment defense, but counsel made the strategic decision not to make Dr. Rosmarin part of that defense.  Given the damaging information contained in the report, the fact that calling Dr. Rosmarin would have opened the door for the Commonwealth's expert to testify, and the ample evidence of Hensley's severe depression offered by family and friends, the SJC concluded that counsel was not ineffective for failing to present Dr. Rosmarin's expert testimony.

For similar reasons, the SJC was not persuaded that counsel had bobbled things by not presenting medical record evidence of Hensley's history of depression, in particular, records from the East Boston Neighborhood Health Center where Hensley treated from 1999 to 2002.  While the records would have shown some history of anxiety and depression, the SJC found that the records may have brought some "unsympathetic facts" to light, such as Hensley's lacking depressive symptoms and refusing counseling. Again, given the abundance of evidence presented by family and friends as to Hensley's mental state, the SJC saw no error in counsel's decision not to introduce these medical records.  As the SJC said, Dr. Rosmarin and the medical records "may well have adversely affected the trial strategy, which was to portray Hensley as a suicidal, yet sympathetic family man."

## D. Habeas Petition

Refusing to be put off, Hensley filed a habeas corpus petition in the federal district court, renewing just the arguments chronicled above, i.e., that his Sixth Amendment right to confrontation was violated when Dr. Flomenbaum's testimony was admitted, and his attorney's failure to introduce certain mental health related evidence transgressed his Sixth Amendment right to effective counsel. The district court denied the petition, concluding that the SJC's decision did not run afoul of the applicable federal law. Hensley now appeals.

## II. DISCUSSION

A district court's decision to deny habeas relief engenders de novo review. Morgan v. Dickhaut, 677 F.3d 39, 46 (1st Cir. 2012). We, like the district court, are guided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. In the case of claims adjudicated on the merits in state court, AEDPA contemplates just two scenarios that warrant a federal court granting habeas relief. Id. § 2254(d)(1)-(2).

For one, a federal court may grant habeas relief if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1). This means we look to the Supreme Court's holdings, as opposed to dicta, at the time the state court

rendered its decision, González-Fuentes v. Molina, 607 F.3d 864, 876 (1st Cir. 2010), while employing the following criteria.

An adjudication will be contrary to clearly established law if the state court "'applies a rule that contradicts the governing law set forth' by the Supreme Court or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (alterations in original)(quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). On the other hand, a state court adjudication constitutes an unreasonable application "if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case." Abrante v. St. Amand, 595 F.3d 11, 15 (1st Cir. 2010) (internal quotation marks omitted). An "'*unreasonable* application of federal law is different from an *incorrect* application of federal law,'" and a state court is afforded deference and latitude. Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410).

The second scenario justifying habeas relief is if the state court adjudication led to "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

-12-

Though this means that a federal court will be taking a closer look at a state court's findings of fact, the fundamental principle of deference to those findings still applies.  See John v. Russo, 561 F.3d 88, 92 (1st Cir. 2009).

A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington, 131 S. Ct. at 786 (internal quotation marks omitted).

The confines of our review clear, we proceed to Hensley's claims.

## A. Admission of Dr. Flomenbaum's Testimony

Hensley solely contends that the SJC's decision as to the admission of Dr. Flomenbaum's testimony was contrary to governing Supreme Court precedent, see 28 U.S.C. § 2254(d)(1), specifically Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  In Melendez-Diaz, which was decided a few months before the SJC issued its decision in this matter, the Supreme Court considered whether a Massachusetts trial court's admission into evidence of certificates of analysis, which reported the results of forensic analysis done on seized drugs, violated the defendant's constitutional rights. See 557 U.S. at 307.  As phrased by the Court, the operative question was whether the certificates were "'testimonial,' rendering the affiant 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment."  Id.

-13-

The court concluded that they were, finding that although under Massachusetts law the moniker for the disputed documents was "certificates," the so-called certificates were "quite plainly affidavits." Id. at 310. Affidavits, the court explained, were squarely within the core class of testimonial statements, which had been previously chronicled in Crawford v. Washington, 541 U.S. 36, 51-52 (2004).[1] See Melendez-Diaz, 557 U.S. at 309-10; see also United States v. Cameron, 699 F.3d 621, 640 (1st Cir. 2012) (explaining that the Supreme Court ruled that admitting the disputed certificates "violated the Confrontation Clause because they fell into the 'core class of testimonial statements' identified in Crawford" (quoting Melendez-Diaz, 557 U.S. at 310)), cert. denied, 133 S. Ct. 1845 (2013). Significantly, the certificates of analysis were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" and, under Massachusetts law, "the *sole purpose*" of the certificates was to provide evidence about the particulars (composition, quantity) of the analyzed substance. Melendez-Diaz, 557 U.S. at 311 (quoting Crawford, 541 U.S. at 52) (internal quotation marks omitted). Thus, the Court concluded that the defendant, pursuant to the protections afforded by the Sixth Amendment, was entitled to be

---

[1] Others included: prior testimony not subject to cross examination, depositions, and confessions.

confronted at trial with the analysts who had performed the forensic testing, absent their unavailability and a prior cross-examination opportunity.  Id.

According to Hensley, Melendez-Diaz "clearly established" that forensic documents, such as autopsy reports, prepared under circumstances that would lead an objective witness to believe the statement would be available for use at a later trial, are testimonial and not admissible absent confrontation.  Since Dr. Zane, the author of Nancy's autopsy report, did not testify, Hensley claims that the autopsy report was non-admissible testimonial hearsay.  From this, Hensley extrapolates that it was error for Dr. Flomenbaum to recite facts contained in the autopsy report and to offer opinions based on the report.[2]  Hensley further claims that the court's admission of the testimony was not, as the SJC found, harmless error.

Unfortunately for Hensley, his Confrontation Clause claim fails from its starting presumption.  The "threshold question" in these types of claims "is whether the challenged statement is testimonial."  United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010).  "If it is not, the Confrontation Clause 'has no application.'"  Id.  (quoting Whorton v. Bockting, 549 U.S. 406, 420 (2007)).

_____

[2] One opinion is excepted.  Hensley does not contest on appeal that Dr. Flomenbaum's opinion as to the cause of death was admissible.

-15-

Here, contrary to the position Hensley takes on appeal, Melendez-Diaz did not say one way or the other whether autopsy reports should be considered testimonial. Indeed, the only allusion to autopsy reports in the majority opinion is in a footnote. There, in response to the dissent's suggestion that the Confrontation Clause is not designed to detect errors in scientific tests, and that other methods such as a new test might better serve that purpose, the majority provided autopsies as an example of a forensic test that cannot be repeated. See Melendez-Diaz, 557 U.S. at 318 & n.5; see also id. at 337 (Kennedy, J., dissenting). The Court in no way - explicitly or implicitly - indicated that autopsy reports are testimonial in nature. It simply used autopsies as an example of a forensic test where do-overs are not possible.

As the Supreme Court stated, Melendez-Diaz "involves little more than the application of" the Crawford v. Washington holding.[3] Melendez-Diaz, 557 U.S. at 329. And notably, although

_____

[3] Given this characterization, it is worth mentioning that post-Crawford and pre-Melendez-Diaz, the weight of the case law appears to be against Hensley. See, e.g., United States v. De La Cruz, 514 F.3d 121, 133 (1st Cir. 2008) (holding that an autopsy report is a non-testimonial business record); United States v. Feliz, 467 F.3d 227, 236 (2d Cir. 2006) (same). Thus, courts consistently rejected Crawford-based habeas petitions that relied upon the supposedly erroneous admission of autopsy reports. See Mitchell v. Kelly, 520 F. App'x 329, 331 (6th Cir. 2013) (per curiam) (holding that the state court did not unreasonably apply Crawford "given the lack of Supreme Court precedent establishing that an autopsy report is testimonial"), cert. denied, 134 S. Ct. 312 (2013); Vega v. Walsh, 669 F.3d 123, 128 (2d Cir. 2012) (per curiam) (holding that the state court's decision was not contrary to Crawford as reasonable jurists could disagree as to whether

Crawford described a core class of testimonial statements (which did not include autopsy reports), it was hardly definitive, "leav[ing] for another day any effort to spell out a comprehensive definition of 'testimonial.'"  Crawford, 541 U.S. at 68.  The Supreme Court continued taking this approach, declining to "produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial" in Davis v. Washington, 547 U.S. 813, 822 (2006).  In other words, things are not as clear cut as Hensley would make them out to be.

Further evidencing the unsettled nature of the issue at hand is how courts have treated autopsy reports following Melendez-Diaz.  Most notably, this court in Nardi v. Pepe stated that "an autopsy report can be distinguished from, or assimilated to, the sworn documents in Melendez-Diaz."  662 F.3d 107, 111 (1st Cir. 2011).  Referring to whether autopsy reports are covered by the Confrontation Clause, we continued: "no one can be certain just what the Supreme Court would say about that issue today."[4]  Id.;

---

autopsy reports came within Crawford's formulations); McNeiece v. Lattimore, 501 F. App'x 634, 636 (9th Cir. 2012) (holding that because Crawford did not clearly establish that autopsy reports are testimonial, the state court's decision that portions of an autopsy report were admissible was not contrary to Supreme Court precedent), cert. denied, 133 S. Ct. 2357 (2013).

[4] In Nardi, we added that even were the Supreme Court to classify autopsy reports as testimonial, it is not clear whether "the admissibility of in-court expert testimony that relied in some measure on such a report would be affected."  662 F.3d at 112.  We noted the witness's ability to be cross-examined and the longstanding tradition of allowing experts to rely on hearsay where

-17-

see also United States v. McGhee, 627 F.3d 454, 459 (1st Cir. 2010) (noting that the Melendez-Diaz Court was "sharply divided" and that the Court's "new slant on the Confrontation Clause is likely to be contested territory for some years"), vacated on reh'g on other grounds, 651 F.3d 153 (1st Cir. 2011).

When other courts, post Melendez-Diaz, have been confronted with the question of whether autopsy reports are testimonial or not, disparity of treatment has reigned. On the one hand, some courts have concluded that autopsy reports are not testimonial. See, e.g., United States v. James, 712 F.3d 79, 99 (2d Cir. 2013) (deciding that the autopsy report at issue "was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"), cert. denied, 2014 WL 2178370 (May 27, 2014); People v. Dungo, 286 P.3d 442, 450 (Cal. 2012) (finding that even though California's statutory scheme required the reporting of suspicious autopsy findings to law enforcement, an autopsy serves several purposes and the "autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial"); Banmah v. State, 87 So. 3d 101, 103 (Fla. Dist. Ct. App. 2012) (concluding that autopsy reports are not testimonial because they are made pursuant to a statutory duty and not, in all instances, used in

doing so is common practice. Id. Given our determination today though, there is no need for us to wade into this thicket.

-18-

prosecutions); <u>People</u> v. <u>Cortez</u>, 931 N.E.2d 751, 756 (Ill. App. Ct. 2010) (finding that <u>Melendez-Diaz</u> did not upset the court's prior holdings that autopsy reports are business records without <u>Crawford</u> implications).

On the flip side, courts have come down the other way, finding autopsy reports testimonial and affording them the protection of the Confrontation Clause. <u>See, e.g.</u>, <u>United States</u> v. <u>Ignasiak</u>, 667 F.3d 1217, 1231 (11th Cir. 2012) (holding that, applying the logic of <u>Crawford</u>, <u>Melendez-Diaz</u>, and <u>Bullcoming</u>, the autopsy reports at issue were testimonial); <u>Commonwealth</u> v. <u>Avila</u>, 912 N.E.2d 1014, 1029, 1030 n.20 (Mass. 2009) (finding that the medical examiner's autopsy report statements were testimonial); <u>Cuesta-Rodriquez</u> v. <u>State</u>, 241 P.3d 214, 228 (Okla. Crim. App. 2010) (holding that in light of Oklahoma's statutory scheme relative to the medical examiner's duty in the case of a suspicious death, an autopsy report in such cases would be testimonial); <u>Wood</u> v. <u>State</u>, 299 S.W.3d 200, 209-10 (Tex. Ct. App. 2009) (holding that although not all autopsy reports are testimonial, given the suspect nature of the victim's death, the subject autopsy report was testimonial).

Of course, for habeas purposes, the operative time period for assessing whether or not a rule is clearly established is at the time the state court renders its judgment, <u>Greene</u> v. <u>Fisher</u>, 132 S. Ct. 38, 44 (2011). However, highlighting later or present

-19-

uncertainty of the law can help us gauge how unsettled the law was at the time the operative state court decision was issued.  See, e.g., Nardi, 662 F.3d at 112 (stating that "we stress the present uncertainty of the law only to emphasize that it was even more unsettled at the time of Crawford just how far that decision would be extended").  As the above cases make clear, even after Melendez-Diaz had been around a little longer, it was still uncertain where autopsy reports stood.  This strongly undercuts Hensley's claim that the testimonial nature of autopsy reports was clearly established.

In an effort to get around this fact, Hensley urges us away from the narrow issue of whether the Supreme Court had, at the time of the SJC decision, determined that autopsy reports in particular are testimonial and asks us instead to focus on the general parameters set by Melendez-Diaz.  He claims Melendez-Diaz clearly established that a forensic document is testimonial if it was prepared under circumstances that would lead an objective witness to believe that it would be available for use at a later trial.  Because the Massachusetts statutory scheme requires (among other things) that if a medical examiner suspects foul play, he or she alert the district attorney and make available any records from the investigation, see Mass. Gen. Laws ch. 38, § 7, Hensley claims that an objective witness would believe that an autopsy report might be used in later criminal proceedings.

Even assuming Hensley has adequately characterized what Melendez-Diaz says, his argument misses the mark. He is correct that AEDPA does not require a "Supreme Court case directly on all fours," and instead it is sufficient if the Court's "general principles can be discerned." White v. Coplan, 399 F.3d 18, 25 (1st Cir. 2005). However, it is also true that the "contrary to" habeas standard is a difficult one to meet; federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene, 132 S. Ct. at 43 (internal quotation marks omitted). The state court decision "must be substantially different from the relevant precedent of [the Supreme] Court." Williams, 529 U.S. at 405.

Taken in this light, we cannot see how the SJC's rejection of Hensley's Confrontation Clause argument was contrary to governing Supreme Court precedent. As we hashed out above, at the time the SJC issued its decision (and indeed well after that), it was not settled that autopsy reports fell within the core class of testimonial documents enumerated in Crawford, or within the parameters set by Melendez-Diaz. Given that the Supreme Court had given no clear answers relative to this issue, it cannot be said

-21-

that the SJC's decision was contrary to clearly established law.[5] Hensley's Confrontation Clause entreaty fails.

## B. Ineffective Assistance of Counsel

The other half of Hensley's appeal relates to his Sixth Amendment right to effective representation. To remind the reader, Hensley faults his counsel for not presenting David Rosmarin, M.D. (the forensic psychiatry expert retained by the defense) as a witness, and for not introducing into evidence medical records pertinent to his mental impairment, and its effect on his capacity. Hensley claims that the SJC's rebuke of his ineffective assistance of counsel claim was an unreasonable application of clearly established federal law, see 28 U.S.C. § 2254(d)(1), as well as an unreasonable determination of the facts given the evidence presented at trial, see id. § 2254(d)(2). We can make quick work of the second part of his contention and so begin there.

## i. Section 2254(d)(2) Claim

Hensley argues that the SJC's determination that counsel was not deficient for failing to introduce his medical records was based in part on clear factual error, which resulted in an unreasonable determination of the facts. See id. In particular, Hensley highlights some of the court's factual findings about

_____

[5] In light of our determination, there is no need to get into whether it was error for Dr. Flomenbaum to testify about, and offer opinions based on, Nancy's autopsy report. Similarly, delving into the impact of the admission of the report on Hensley's case, i.e., whether it was harmless error, will not be required.

-22-

portions of his medical records, which the court perceived could have had a negative impact on the jury, thus validating counsel's decision not to introduce the records.

The problem is that although Hensley frames this as a fact-based habeas challenge, a review of his brief reveals that he does not dispute the accuracy of any of the SJC's factual determinations. Rather, Hensley quibbles with the emphasis the court put on certain facts or the context in which the court placed the facts. For example, Hensley complains that the SJC's finding that "Hensley was greatly concerned that his depression medication was impairing his sexual performance" bore no relevance. Hensley also faults the district court for not mentioning - when it found that Hensley "had showed no symptoms of depression during two separate visits" - that those visits occurred back in 1999. In other words, Hensley does not even allege that the court's factual findings were erroneous, let alone furnish us with evidentiary support to overcome the "fundamental principle of deference to state court findings" that § 2254(d)(2) calls for. John, 561 F.3d at 92 (internal quotation marks omitted). There is no more to be said. Hensley's § 2254(d)(2) challenge fails.

## ii. Section 2254(d)(1) Claim

The rest of Hensley's ineffective assistance habeas claim goes like so. According to Hensley, the SJC's determination that his Sixth Amendment right was not abridged - either by counsel's

-23-

failure to call Dr. Rosmarin or introduce the medical records - was an unreasonable application of <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984).[6]  <u>See</u> 28 U.S.C. § 2254(d)(1).

For a defendant to be entitled to reversal of a conviction pursuant to <u>Strickland</u>, he must make a two part showing. 466 U.S. at 687.  The first piece is that defense counsel's performance was deficient, that is, the attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id.</u>  On top of a flawed performance, there must also be prejudice to the defense.[7]  <u>Id.</u>  It must be "reasonably likely" that the result of the criminal proceeding would have been different, <u>id.</u> at 696, and that likelihood "must be substantial, not just conceivable."  <u>Harrington</u>, 131 S. Ct. at 792.  The defendant's burden is a heavy one, <u>Turner</u> v. <u>United States</u>, 699 F.3d 578, 584 (1st Cir. 2012), and an ineffective assistance of counsel showing is not an easy one

---

[6] The SJC actually considered Hensley's ineffective assistance of counsel claim under <u>Commonwealth</u> v. <u>Williams</u>, which, like <u>Strickland</u>, places a dual focus on counsel's performance and defendant's prejudice.  <u>See</u> 900 N.E.2d 871, 874 (Mass. 2009) (citing <u>Commonwealth</u> v. <u>Wright</u>, 584 N.E.2d. 621, 624 (Mass. 1992)). The Massachusetts standard employed by the SJC is at least as protective of defendants as the federal standard.  <u>See</u> <u>Yeboah-Sefah</u> v. <u>Ficco</u>, 556 F.3d 53, 70 n.7 (1st Cir. 2009).  Hensley does not claim otherwise.

[7] Given that neither the SJC nor the district court saw any problem with how counsel comported himself, they did not consider the prejudice prong.

-24-

to make given our deferential review, United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012).

Since we are considering a habeas challenge, we are not actually tasked with deciding whether Hensley's counsel's performance fell short of Strickland's requirements; rather the "pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 131 S. Ct. at 785. Here, it is clear, the SJC's application was not unreasonable. We start with the retained (but not called) forensic psychiatrist, Dr. Rosmarin.

As the SJC noted, Dr. Rosmarin's testimony, according to his later obtained affidavit, would have been a mixed bag. For instance, Dr. Rosmarin concluded that Hensley suffered from Major Depression, and in the moments before Nancy's killing, could not "conceive of" killing Nancy or weigh such a decision or "act in furtherance of this weighing." Hensley "was not able to form the intent to kill or inflict grievous bodily harm" because mental impairment and dissociative symptoms prevented him from doing so. Not surprisingly, Hensley hones in on these statements; however, Dr. Rosmarin's take was not all favorable. Dr. Rosmarin had also determined that Hensley "did not lack criminal responsibility for the killing." And Dr. Rosmarin relayed Hensley's grisly description of the murder. Particularly, Hensley stated that he

was "angry" and "afraid I might beat [Nancy] up." Hensley said he started "choking her," stating "[y]ou destroyed me and my family."

"The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004). Here, in addition to keeping out some potentially nocuous testimony, trial counsel's decision not to call Dr. Rosmarin meant that the state could not present the rebuttal expert witness that it had retained. It is on Hensley to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation marks omitted). It is plain that he has not done that here.

We reach the same conclusion as to Hensley's East Boston Neighborhood Health Center medical records. As with Dr. Rosmarin's testimony, it is possible the medical records would have done more harm than good to Hensley's case. The records did evidence Hensley's history of depression and anxiety. However, as the SJC pointed out, a jury may not have looked favorably on other portions of the records, e.g., many notations regarding Hensley's concern with how his anti-anxiety medication was affecting his sexual performance (albeit with a couple of mentions of how this was impacting his marriage), a notation about Hensley's lack of

depressive symptoms, as well as one regarding a refusal to go to counseling.

To prevail under Strickland, counsel's choice must have been "so patently unreasonable that no competent attorney would have made it." United States v. Rodriquez, 675 F.3d 48, 56 (1st Cir. 2012) (internal quotation marks omitted). Given the possible negative impact of the medical records, and the fact that other evidence (family and friend testimony) demonstrated Hensley's depression, we find it hard to see how defense counsel's decision not to introduce the East Boston Neighborhood Health Center medical records was patently unreasonable.

To sum things up, the SJC reasonably determined that defense counsel's decision not to call Dr. Rosmarin, or present the subject medical records, was sound. Hensley's attorney clearly investigated and pursued a mental incapacity defense. Counsel retained Dr. Rosmarin and had him evaluate Hensley three times prior to trial. Counsel obtained Hensley's East Boston Neighborhood Health Center medical records and provided these records to Dr. Rosmarin. Counsel then reasonably elected to try and establish Hensley's mental impairment through testimony from his friends and family, choosing not to introduce expert testimony from a forensic psychiatrist or the medical records pertaining to Hensley's mental health treatment. Counsel obtained a mental impairment instruction and argued in summation that Hensley's

impairment made murder in the second degree the more appropriate choice.

Relief pursuant to 28 U.S.C. § 2254(d)(1) is not called for when this court might merely have a differing opinion as to how things should have turned out. See Sanna v. Dipaolo, 265 F.3d 1, 13 (1st Cir. 2001). To the contrary, the "state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate it is outside the universe of plausible, credible options." Id. (internal quotation mark omitted). This is a high hurdle, which we are not even close to surmounting here. Hensley has failed to cast doubt on the SJC's decision as to his Sixth Amendment ineffective assistance of counsel claim. The SJC did not unreasonably apply Strickland when it concluded that Hensley's attorney's performance was not deficient.[8] Hensley's § 2254(d)(1) contest is without merit.

### III. CONCLUSION

Both Hensley's Sixth Amendment right to confrontation offering, and right to effective representation imploration, fall short. The district court's denial of Hensley's petition for habeas relief is affirmed.

---

[8] Because (as we see it) the SJC's determination regarding counsel's performance was not unreasonable, we need not get into Strickland's prejudice component.

-28-