# United States Court of Appeals
## For the First Circuit

No. 20-1160

MALIK BREYON HOLLIS,

Petitioner, Appellant,

v.

MATTHEW MAGNUSSON, Warden, Maine State Prison,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Lipez, and Kayatta,
Circuit Judges.

James P. Howaniec for petitioner.

Donald W. Macomber, Assistant Attorney General, with whom
Aaron M. Frey, Attorney General, was on brief, for respondent.

April 19, 2022

**LIPEZ**, **Circuit Judge**.  Petitioner Malik Hollis, a Black man, was convicted in the Maine Superior Court on weapons charges stemming from his actions in a racially charged confrontation with four white men.  He now appeals from the district court's denial of his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, in which he contends that the prosecution violated Batson v. Kentucky, 476 U.S. 79 (1986), when it peremptorily struck the sole person of color from the jury pool.  Reviewing Hollis's claim pursuant to the demanding standards that govern this collateral attack on his state court conviction, we are constrained to affirm the district court's denial of his habeas petition.

**I.**

We begin with an explanation of the relevant legal background regarding jury selection.  The Supreme Court held in Batson that the Equal Protection Clause precludes the prosecution from using its peremptory challenges to strike "potential jurors solely on account of their race."  476 U.S. at 89.[1]  The Court has explained that "racial discrimination in jury selection" not only

---

[1]  In subsequent cases, Batson has been extended to cover, inter alia, peremptory strikes by defendants and peremptory strikes by parties in civil cases, as well as to prohibit peremptory strikes based on sex.  See Flowers v. Mississippi, 139 S. Ct. 2228, 2243 (2019).  The Supreme Court has also recognized that individual jurors have an equal protection right not to be excluded from a jury based on race.  See Powers v. Ohio, 499 U.S. 400, 409 (1991).  These applications are not at issue in this appeal.

"compromises the right of trial by impartial jury" but also "establish[es] 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.'" Miller-El v. Dretke ("Miller-El II"), 545 U.S. 231, 237-38 (2005) (quoting J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128 (1994)). Given the gravity of the harm, the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." Foster v. Chatman, 578 U.S. 488, 499 (2016) (quoting Snyder v. Louisiana, 552 U.S. 472, 478 (2008)). To raise a Batson claim,

> the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strike. Third, if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

Johnson v. California, 545 U.S. 162, 168 (2005) (internal quotation marks omitted) (footnote omitted) (citations omitted) (alterations omitted). The defendant "ultimately carries the 'burden of persuasion' to 'prove the existence of purposeful discrimination.'" Id. at 170-71 (quoting Batson, 476 U.S. at 93). Generally, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." Hernandez v. New York, 500 U.S. 352, 364 (1991) (plurality opinion).

## II.

In May 2016, Hollis was involved in an altercation with four white men outside an apartment building in Lewiston, Maine.[2] State v. Hollis, 189 A.3d 244, 245 (Me. 2018). Although the precise nature of the altercation is disputed, "[o]ne of the men involved in the incident . . . acknowledged that he hit Hollis with a metal handlebar"; "that he 'called [Hollis] the N word and told him [he] was going to fucking kill him'"; and that "one of the other men on his side had an aluminum baseball bat and another had a baton." Id. at 245 n.2. It is also undisputed that, at some point, Hollis ran around the corner to his apartment, returned with a gun, and fired it into a nearby dirt pile. Id. at 245. Hollis was arrested and charged with reckless conduct with a dangerous weapon (Class C), Me. Stat. tit. 17-A, §§ 211(1), 1254(4) (2017), and criminal threatening with a dangerous weapon (Class C), Me. Stat. tit. 17-A, §§ 209(1), 1254(4) (2017). Id.

At jury selection for Hollis's trial, Juror 71 was the sole person of color in the venire of thirty-two randomly selected prospective jurors.[3] Id. at 245-46. Prospective juror information

---

[2] We recite the facts as set forth by the Maine Supreme Judicial Court, sitting as the Law Court ("Law Court"), in its decision on direct appeal. See Hardy v. Maloney, 909 F.3d 494, 497 (1st Cir. 2018) (citing 28 U.S.C. § 2254(e)(1)).

[3] The parties and the courts that have previously considered this matter consistently refer to Juror 71 as a "person of color." The juror's race is not otherwise definitively identified in the

- 4 -

provided to the parties established that Juror 71 had an eleventh-grade education, the lowest education level of any of the thirty-two prospective jurors.  Id. at 246.  After neither side challenged Juror 71 for cause, the prosecutor used a peremptory challenge to strike the juror.  Id.; see Me. R. Unified Crim. P. 24(c).  The following exchange then occurred at sidebar:

> Defense Counsel:  I just -- I guess I'll put on the record that I object. . . . It's the only person of color on the jury, just for the record.
>
> The Court:  You're objecting because [] number 71 is a man of color and you're --
>
> Defense Counsel:  As it's --
>
> The Court: Hasn't been systemic.
>
> Defense Counsel: Yeah.
>
> The Court: I can't make any findings.
>
> Defense Counsel: No, I know.  I understand.  We're trying to explore here in Androscoggin County why we're not seeing more people of color on our juries and not seeing people of Muslim faith.  We have a large Somali population.  We have one person of color in the entire jury pool.  I just wanted to put that on the record.

_____

record.  Neither party makes anything of this imprecise descriptor, nor do they otherwise suggest that it should impact our analysis. This is for good reason, as "[t]he proper focus of a Batson inquiry . . . is not whether the defendant or excluded juror is part of a [particular racial group], but rather whether 'a peremptory challenge was based on race.'"  Sanchez v. Roden, 753 F.3d 279, 292 (1st Cir. 2014) (quoting Snyder, 552 U.S. at 476); see also Powers, 499 U.S. at 402 ("[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races.").

- 5 -

Prosecutor:  Would the Court like any response from me --

The Court: You may.

Prosecutor:  -- or is that necessary?

The Court:  If you want to respond.

Prosecutor:  I just would put that his ethnicity had no bearing in regards to why I struck him.  I was looking for his level of education and other various factors that were provided in the list from the court.

The Court:  I mean, I guess the only observation I would make is that we're looking at a -- sort of a systemic -- where the State was systematically excluding someone because of either race or gender or I don't know whether it's -- I'm not sure whether the State was talking about that but I can't make that -- I can't certainly make that finding based upon --

Defense Counsel:  Totally understand.

The Court:  One, because there could be other legitimate factors, as [the prosecutor] points out, as to why this particular juror would be struck by the State.

The parties then moved on to complete the selection of the other jurors.

After a two-day trial, at which the defense strategy was to argue self-defense and the jury was given a self-defense instruction, the jury convicted Hollis on both counts.  Hollis, 189 A.3d at 246.  He was sentenced to three years' incarceration on each count, to be served concurrently.

- 6 -

Two weeks later, Hollis filed a motion for acquittal, or in the alternative a new trial, contending that the prosecutor's strike of Juror 71 violated Batson. Id. In response to Hollis's motion and at a subsequent hearing -- held more than two months after jury selection -- the prosecutor again contended that she struck Juror 71 based on his level of education.[4]

In its subsequent written order, the Superior Court recognized that it had erred at the time of jury selection by suggesting that it needed to see evidence of "systemic" discrimination and neglecting to perform the proper analysis prescribed by the Supreme Court in Batson. Now undertaking that analysis, the court determined that "the prosecutor's strike of Juror 71 was not exercised with a discriminatory intent or purpose. Rather, the court finds that the prosecutor's stated, race-neutral reason was the actual reason for the striking of this juror."

---

[4] In its response to Hollis's motion for acquittal, and at the hearing, the prosecution elaborated on its education-based rationale for the strike -- that the self-defense affirmative defense "is a somewhat complicated concept for jurors to deal with" -- and also proffered an additional reason for striking Juror 71 -- that Juror 71's demeanor and responses at voir dire in an unrelated domestic violence case had led the prosecutor to conclude that Juror 71 "had a fairly nonchalant attitude towards violence." Ultimately, the Superior Court and the Law Court did not rely on the "nonchalant attitude" reason or the prosecution's further elaboration of the education-level rationale, based on precedent counseling that a prosecutor must stand or fall on the reasons for the peremptory strike provided at the time the objection to the strike is made. See, e.g., Miller-El II, 545 U.S. at 246-52.

- 7 -

Regarding this race-neutral reason -- Juror 71's education level -- the court opined:

> [I]t was the prosecutor herself without prompting from the court, who explain[ed] that her reason for striking Juror 71 was based on his level of education. At the time, the court found nothing about the prosecutor's explanation that was not credible and believable. Moreover, an examination of all of the State's peremptory strikes and the composition of the jury that was ultimately seated, confirms that the State's overall strategy in exercising its peremptory challenges was focused on having jurors with high education levels. While some (3) of the State's nine strikes were exercised against potential jurors with some post-secondary school education, the prosecutor explained at the [post-trial] hearing that as to the juror with a college degree, the juror's record was the reason for that strike.[5] The jury that was seated had six with at least a college education.

In response to the fact that half of the seated jurors only had a twelfth-grade education,[6] the court stated, "peremptory strikes are not unlimited, and it is inevitable that although the strategy is to have more highly educated jurors, that goal cannot be met in its entirety."[7]

---

[5] The juror information before the court indicated that the State's first five peremptory strikes immediately before the strike of Juror 71 were exercised against potential jurors with a 12th-grade education or higher, but who also had criminal records, records of driving violations, or both.

[6] It is not entirely clear from the record if the jurors who were marked as having a twelfth-grade education were high school graduates or merely had some schooling at the twelfth-grade level.

[7] The Superior Court additionally noted that it was "satisfied by its first-hand observation of the prosecutor at sidebar when Juror 71 was struck, that her volunteered explanation was genuine

Hollis timely appealed to the Maine Law Court. In its decision, the Law Court reviewed for clear error the Superior Court's determination "that Hollis had not shown purposeful discrimination." Hollis, 189 A.3d at 247. Noting that Hollis bore the burden of demonstrating that the prosecution acted on the basis of purposeful discrimination, the court concluded that he had "not established that the record compelled the [trial] court to find that the prosecutor's explanation [for striking Juror 71] was a pretext for discrimination." Id. at 248. Despite the court's skepticism "of a proffered explanation for striking a juror based on low education level without individual voir dire on intelligence or education," it ultimately determined that the record supported the proposition that "the State's jury selection strategy favored jurors with more education" and that striking Juror 71 merely reflected this strategy. Id. The court further commented that "[d]ue to the complexity of the law of self-defense . . . this proffered strategy was not unreasonable." Id. at 248 n.4 (citing Me. Stat. tit. 17-A, § 108 (2017) and Donald G. Alexander, 1 Maine Jury Instruction Manual § 6-58 (2017-2018 ed.)).

Hollis subsequently filed a petition for habeas corpus in the District of Maine. The district court, in a thoughtful

---

and not a pretext for racial animosity towards the juror." Because the Law Court did not mention this finding in its decision, we also do not comment on it further.

order affirming the thorough report and recommendation of the magistrate judge, denied the petition and a certificate of appealability. Hollis then appealed to this court and requested a certificate of appealability, which we allowed.

**III.**

A federal court's consideration of a collateral attack on a state court conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The statute provides that habeas relief

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). It is well established that "[a] state court decision is 'contrary to' clearly established federal law 'if the state court applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" Linton v. Saba, 812 F.3d 112, 122 (1st Cir. 2016) (quoting Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014)).

- 10 -

On the other hand, "a state court adjudication constitutes an unreasonable application [of clearly established federal law] if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the . . . case." Id. (quoting Hensley, 755 F.3d at 731).

Importantly, "an unreasonable application of federal law is different from an incorrect application of federal law." Scott v. Gelb, 810 F.3d 94, 101 (1st Cir. 2016) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). If "'fairminded jurists could disagree' on the correctness of the state court's decision," there was no "unreasonable" application of federal law. Id. (quoting Harrington, 562 U.S. at 101). An "unreasonable determination of the facts" under § 2254(d)(2) is one that is "objectively unreasonable in light of the evidence presented in the state-court proceeding" and which has been "rebutted by clear and convincing evidence to the contrary." Miller-El v. Cockrell ("Miller-El I"), 537 U.S. 322, 340, 341 (2003). All told, "[w]hen a habeas claim has been adjudicated on its merits in state court, [AEDPA] mandates highly deferential federal court review of state court holdings." Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009).

**IV.**

Bound by this framework, we review the district court's decision to deny Hollis's habeas petition de novo, "determin[ing]

- 11 -

whether the habeas petition should have been granted in the first instance." Sanchez v. Roden, 753 F.3d 279, 293 (1st Cir. 2014). There is no dispute that Hollis established a prima facie case before the Superior Court that the peremptory strike of Juror 71 violated Batson, and that the prosecution offered a race-neutral explanation for the strike. The Law Court's decision turned on whether the Superior Court clearly erred in determining that there was no discriminatory purpose behind the strike. In our position as a federal court reviewing a state court conviction under AEDPA, the precise question before us is whether the Law Court's decision affirming the Superior Court was based on an unreasonable determination of the facts.

The Law Court concluded that the Superior Court did not clearly err when it determined that the prosecution's race-neutral explanation for striking Juror 71 -- his eleventh-grade education -- was not pretextual and thus that there was no purposeful discrimination. This conclusion is supported by the record, which demonstrates that every member of the empaneled jury (twelve jurors, plus two alternates) had at least a twelfth-grade education, with eight jurors having attained a higher education level. In other words, no member of the empaneled jury had the same lower education level as Juror 71. Moreover, as the Law Court noted, Hollis, 189 A.3d at 247-48, a trial court's determination on the issue of discriminatory intent is ordinarily

afforded considerable deference.  See Miller-El I, 537 U.S. at 340 ("In the context of direct review . . . we have noted that 'the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal' and will not be overturned unless clearly erroneous." (quoting Hernandez, 500 U.S. at 364)).  Thus we have deference on top of deference -- the Law Court's deference to the decision of the Superior Court and our deference to the decision of the Law Court.

The cases Hollis cites only serve to emphasize the elements of a successful Batson claim that are lacking here.  See, e.g., United States v. Young, 753 F.3d 757, 781 (8th Cir. 2014) (suggesting that striking an African-American juror based on unemployment could be seen as pretextual "because other similarly situated white jurors were also unemployed"); Jimenez v. City of Chicago, 732 F.3d 710, 714 (7th Cir. 2013) (noting that the failure to strike a similarly situated white juror undermined the credibility of the stated reason for striking an African-American juror); McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1265 (11th Cir. 2009) (noting that the prosecution's strike of multiple jurors for "low intelligence" "was unsupported by any evidence in the record"); see also Flowers v. Mississippi, 139 S. Ct. 2228, 2235 (2019) (noting that "the State . . . struck at least one black

- 13 -

prospective juror . . . who was similarly situated to white prospective jurors who were not struck by the State").

Here, it is undisputed that Juror 71 had an eleventh-grade education and that all members of the seated jury had attained a higher education level.  Hollis has not developed any argument that the prosecution failed to strike similarly situated white jurors.  He has not developed an argument about the similarity or dissimilarity of jurors with eleventh-grade versus twelfth-grade educations for the purposes of the Batson analysis. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .").  Nor has Hollis developed any argument concerning the State's previous use of peremptory strikes or evidence of racially disparate education levels in Androscoggin County.  See Flowers, 139 S. Ct. at 2235 (noting that a Batson claim can be supported by, inter alia, "relevant history of the State's peremptory strikes in past cases" or "other relevant circumstances that bear upon the issue of racial discrimination").

Hollis's contention that no evidence was ever "produced that this prosecutorial district has ever struck jurors because of high school levels of education in Androscoggin County" does not help him.  It was ultimately Hollis's burden to prove a Batson violation, and the prosecution therefore had no obligation to

produce such evidence.  For these reasons, then, we simply cannot conclude that the Law Court's decision was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

All of this said, we acknowledge that the facts of this appeal are concerning.  In a case with explicit racial overtones, the trial court initially failed to properly apply Batson when the prosecution struck the sole juror of color for a seemingly trivial reason.  But, bound by the AEDPA framework, we must affirm the district court's denial of Hollis's habeas petition.

So ordered.

**-Concurring Opinion Follows-**

- 15 -

**LIPEZ, <u>Circuit Judge</u>, concurring.** For the reasons provided in the panel opinion, we must affirm the district's court dismissal of Hollis's habeas petition. Yet the outcome required by the law does not address aspects of this case that "raise the judicial antennae." <u>Sanchez</u> v. <u>Roden</u>, 808 F.3d 85, 97 (1st Cir. 2015) (Thompson, J., concurring). Indeed, every court that has considered this case, including the Superior Court itself, has expressed concerns about what transpired at jury selection.[8]

As described in the panel opinion, a highly experienced and able Superior Court judge misapplied long-standing Supreme Court precedent -- although, to the judge's credit, he recognized and addressed this error post-trial. What is more, the reason proffered by the prosecutor and accepted by the court for striking

---

[8] At oral argument on Hollis's motion for acquittal or a new trial, the Superior Court noted to the prosecutor its concern "that you're sort of opening yourself up to a challenge when you have a black defendant and you [strike the sole] black member of the jury pool." The prosecutor replied: "I guess I wasn't really thinking far ahead to that." As noted, the Law Court expressed skepticism about the prosecutor's proffered reason for striking Juror 71. <u>State</u> v. <u>Hollis</u>, 189 A.3d 244, 245 (Me. 2018). The district court added its own cogent observation:

> When using a peremptory challenge to strike the only African-American from a jury pool in a case where the defendant is African-American, the state prosecutor should have been cognizant of <u>Batson</u> and, before exercising the peremptory challenge, should have considered whether the explanation, namely that Juror #71 had a one-year difference in education from other prospective jurors, would satisfy the <u>Batson</u> requirement of a facially[] neutral explanation when challenged.

<u>Hollis</u> v. <u>Magnusson</u>, 2020 WL 110748, No. 1:19-cv-00322-JAW, at *3 n.4 (D. Me. Jan. 9, 2020) (citations omitted).

Juror 71 -- level of education -- is troubling.  The First Circuit has previously noted that peremptory strikes based on education level are permissible, but such strikes have generally been accepted in especially complex cases.  See Caldwell v. Maloney, 159 F.3d 639, 654-55 (1st Cir. 1998).  Other than the Law Court's observation that the law of self-defense in Maine is complex, there is simply no indication in the record that this was an especially complex case.  And strikes based on a juror's level of education in the absence of a clear connection to the case's complexity may come perilously close to resembling strikes based on amorphous concepts of "intelligence" that have been rejected by courts, and that perpetuate deplorable and wholly unjustified racist stereotypes about Black mental acuity.  See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1267 (11th Cir. 2009); see also Jeffrey Bellin & Junichi P. Semitsu, Widening Batson's Net to Ensnare More than the Unapologetically Bigoted or Painfully Unimaginative Attorney, 96 Cornell L. Rev. 1075, 1098 & n.136 (2011).

Like the Law Court, I am skeptical "of a proffered explanation for striking a juror based on low education level without individual voir dire on intelligence or education." State v. Hollis, 189 A.3d 244, 245 (Me. 2018).  More specifically, I question whether Juror 71's eleventh-grade education level was a credible basis for striking him. Arguably, the distinction between an eleventh-grade and a twelfth-grade education is so minimal for

- 17 -

purposes of understanding the legal concepts at issue in Hollis's trial, and so worthless as a proxy for mental ability, that Juror 71 was indeed treated differently than his similarly situated white peers in the jury pool.

Further, the reason later provided by the prosecutor to bolster the strike of Juror 71 -- that the juror exhibited a "nonchalant attitude towards violence" in jury selection for an unrelated domestic violence case -- only raises more questions. Although we cannot reconstruct the juror's demeanor on the cold record, the transcript from that jury selection does not in any way demonstrate the purported nonchalance.[9] Nor did the prosecutor

---

[9] The entire on-the-record exchange with Juror No. 71 during jury selection for the domestic violence case reads as follows:
Court: Because you answered that first question that you have a close friend or relative who is the victim of domestic violence, [we] wanted to get more information about that.
Juror No. 71:  It was my grandmother.
Court: It was your grandmother who was the victim?
Juror No. 71:  Yeah.
Court:  At the hands of your grandfather?
Juror No. 71:  No, boyfriend.
Court: A boyfriend.  Okay.  And you were a child at the time?
Juror No. 71:  Yeah.
Court:  How many -- how many years ago would that have been?
Juror No. 71:  I'm 28 now so 7 or 8 maybe.
Court: You remember it? Did you actually witness it?
Juror No. 71:  Yeah.  I was in the middle of it.
Court: Do you still feel that [] -- you could be fair and impartial in a case that involves allegations of domestic violence?
Juror No. 71:  Would that bother me?
Court: Would you be fair and impartial?
Juror No. 71:  Oh, yeah, yeah, of course.
Court [to the prosecutor]: [D]o you have any questions you want to follow up?

in that case raise an objection to the juror based on his attitude or pursue further questioning.  If this reason had been provided at the time of the initial objection under <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79 (1986), and considered by the Superior Court, its utter flimsiness may well have cast doubt on the education-level rationale and the strike in general.

Beyond the specific troubling aspects of this case, there are the problematic limitations of the <u>Batson</u> framework more generally.  As Justice Marshall noted in his concurring opinion in <u>Batson</u>, the <u>Batson</u> inquiry can only go so far in rooting out peremptory strikes based on race because "trial courts are ill-equipped to second-guess th[e] reasons" for a strike asserted by the prosecutor, and "unconscious racism" may result in the proffer and acceptance of a "racially neutral" reason for a strike that is in fact rooted in racial bias.  <u>Batson</u>, 476 U.S. at 106 (Marshall, J., concurring).[10]

---

Prosecutor:  I don't
Defense Counsel:  You saying -- does that mean you were in the household?
Juror No. 71: I was in the house but I witnessed it.  I witnessed everything.
After the juror was excused from sidebar, the court and defense counsel noted his "[g]ood qualities."  The prosecutor did not comment.

[10] In Justice Marshall's view, "end[ing] the racial discrimination that peremptories inject into the jury-selection process . . . can be accomplished only by eliminating peremptory challenges entirely." <u>Batson</u>, 476 U.S. at 102-03 (Marshall, J., concurring).  However, Justice Marshall also acknowledged the "long and widely held belief that peremptory challenge is a

Since Justice Marshall's prescient concurrence, jurists and commentators have extensively analyzed how the Batson framework has serious limitations both when used to ferret out purposefully discriminatory strikes and to address "implicit bias." See, e.g., Miller-El v. Dretke ("Miller-El II"), 545 U.S. 231, 268 (2005) (Breyer, J., concurring) ("Given the inevitably clumsy fit between any objectively measurable standard and the subjective decisionmaking at issue, I am not surprised to find studies and anecdotal reports suggesting that, despite Batson, the discriminatory use of peremptory challenges remains a problem."); United States v. Young, 6 F.4th 804, 811 (8th Cir. 2021) (Kelly, J., concurring) (discussing, in the context of Batson, how "social psychologists . . . have found that individuals may harbor implicit biases even though they consciously decry comparable, explicit prejudices"); Shirley v. Yates, 807 F.3d 1090, 1110 n.26 (9th Cir. 2015), as amended (Mar. 21, 2016) (providing as an example of how implicit bias can underlie a facially race-neutral reason that "[p]rosecutors might well conceive of 'life experience' in ways that have a profoundly disparate impact on members of different racial groups"); Christine Jolls & Cass Sunstein, The Law of Implicit Bias, 94 Cal. L. Rev. 969, 978 n.45 (2006) (collecting

necessary part of trial by jury." Id. at 108 (quoting Swain v. Alabama, 380 U.S. 202, 219 (1965), overruled on other grounds by Batson, 476 U.S. at 92).

sources on the law's "general failure to address the problem of implicit bias," including in the Batson context); Antony Page, *Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge, 85 B.U. L. Rev. 155, 156-61, 178 n.102 (2005).

In particular, the Batson inquiry is often reliant on a court's consideration of the demeanor of the party exercising the challenged peremptory strike.  See Snyder v. Louisiana, 552 U.S. 472, 477 (2008) ("[T]he best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." (internal quotation marks omitted)).  But demeanor can itself be a problematic basis for believing a proffered racially neutral reason for the strike where unconscious bias is at work and the party exercising the strike may even be "l[ying] to himself in an effort to convince himself that his motives are legal." Batson, 476 U.S. at 106 (Marshall, J., concurring) (quoting King v. Nassau Cnty., 581 F. Supp. 493, 502 (E.D.N.Y. 1984)).[11]

Still, even with its limitations, Batson retains its importance in addressing the problem of racially based peremptory

---

[11] Beyond "implicit bias," parties are finding increasingly sophisticated ways of cloaking racially based strikes in facially neutral rationales.  See Miller-El II, 545 U.S. at 270 (Breyer, J., concurring) (citing Post, A Loaded Box of Stereotypes: Despite "Batson," Race, Gender Play Big Roles in Jury Selection, Nat. L. J, Apr. 25, 2005, at 1, 18, and noting that "the use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before").

strikes.  Indeed, because of these limitations, courts and parties must be particularly conscious of the vexing issue of bias and carefully apply Batson when faced with a suspect strike.  In this case, the trial court judge and the prosecutor, as they have acknowledged, were unprepared, when the issue first arose, to properly address the striking of the sole prospective juror of color in a case with unmistakable racial overtones.  Hopefully, in the future, with this case as a cautionary tale, any Batson issue will be addressed properly during jury selection.