# United States Court of Appeals
## For the First Circuit

No. 14-2110

DAMION LINTON,

Petitioner, Appellant,

v.

JAMES J. SABA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

James M. Doyle, with whom Bassil, Klovee & Budreau, was on brief, for appellant.
Todd M. Blume, Assistant Attorney General, Criminal Bureau, with whom Thomas E. Bocian, Assistant Attorney General, and Maura Healey, Attorney General, were on brief, for appellee.

February 1, 2016

**TORRUELLA**, **Circuit Judge**. On February 23, 2005, Andrea Harvey's parents discovered her body in Harvey's Cambridge apartment. Her husband, Damien Linton, was subsequently arrested and convicted of first-degree murder by a jury in the Massachusetts Superior Court ("Superior Court"). The Massachusetts Supreme Judicial Court ("SJC") affirmed the verdict as well as the Superior Court's denial of Linton's motion for a new trial on appeal. Commonwealth v. Linton, 924 N.E.2d 722, 727 (Mass. 2010).

Linton filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts on the grounds that (1) the evidence was insufficient to support his conviction and (2) the admission of statements Harvey made to her father violated his rights under the Confrontation Clause. The district court denied Linton's petition for habeas relief. Linton v. Saba, No. 11-40132-TSH, 2014 WL 4804746, at *11 (D. Mass. Sept. 25, 2014). After careful review utilizing the standards under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we affirm the judgment of the district court.

## I. Background

"We must 'accept the state court findings of fact unless . . . convince[d] . . . by clear and convincing evidence, that they are in error.'" Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006) (quoting McCambridge v. Hall, 303 F.3d 24, 26 (1st Cir.

2002) (en banc)). Thus, we recount the facts as found by the SJC, and note supplementary facts from the record as such. O'Laughlin v. O'Brien, 568 F.3d 287, 290 (1st Cir. 2009).

Damion Linton lived with his wife, Andrea Harvey, at their apartment in Cambridge, Massachusetts ("Cambridge apartment"). Linton met Latricia Carter in January 2005 and began a sexual relationship with her on February 14, 2005. He did not tell Carter he was married but claimed he had an "ex-girlfriend" who had threatened to buy "a bottle of pills to do something to herself and make everyone think that he did it to her" if he ended the relationship.

On the morning of February 23, Carter was scheduled to complete tests for work at a facility in Somerville, Massachusetts, near Linton's apartment. Linton and Carter made plans for Carter to visit him at the Cambridge apartment before her tests. When Carter arrived, however, she had to ring the doorbell twice and wait in the first-floor entryway. Carter was about to leave when Linton came downstairs, mid-cell phone conversation. After Linton finished the call, Carter asked Linton why he had finished the conversation in the entryway despite the cold. Then she heard a loud sound coming from upstairs. Linton told Carter, "Well you know that crazy, crazy girl I told you about, she's upstairs." Carter returned to her vehicle, which was parked on the street

-3-

outside the apartment; Linton followed and got into the passenger seat. The pair began arguing in the truck -- Carter demanding explanations, Linton eventually admitting to living with the woman in the apartment -- and continued until a woman matching Harvey's description came outside and discovered them. The woman peered through the vehicle's open window.[1] She exclaimed, "Oh, my gosh, another woman," and demanded Linton return her phone. He did so, then Carter drove away with Linton in the passenger seat. The pair circled the neighborhood, once passing Harvey walking on the street one block from the apartment, before Carter let Linton out and left. Carter arrived at the testing facility at some point before 8:45 a.m. She completed two tests, then went to work.

Carter next heard from Linton while at work, around 1:30 p.m. Linton claimed he had fought with Harvey over Carter and "had to pack a bag and leave" because Harvey was threatening to harm herself and frame him. Linton asked to stay with Carter. She refused. At 1:30 p.m., according to videotape and bank records, Linton withdrew $100 from a Cambridge Trust ATM that was a ten-minute walk from the Cambridge apartment. Linton subsequently traveled to New York City, making his way to the Port Authority bus terminal by 7:51 p.m., the time at which he

---

[1] This detail is not entirely clear, but it appears the fighting couple left the truck window open rather than opening it to return the phone. Linton, 924 N.E.2d at 729.

-4-

telephoned Harvey's cell phone from a public phone "near a gate where a Greyhound bus was leaving for North Carolina."

On February 24, Linton arrived in North Carolina,[2] where his brother lived, and applied for a job at the Wal-Mart where his brother worked, explaining to the manager that he was moving to Raleigh after a fight with his wife and seeking full-time employment. That day, Linton also spoke to Harvey's parents ("Mr. and Mrs. Harvey") by phone. He told Mrs. Harvey that he was calling from North Carolina, claiming that he had traveled there to retrieve items his mother had sent from Jamaica. Linton also told Mrs. Harvey that he had been trying to get in touch with her daughter but had not been able to do so and was worried because she had threatened to harm herself if he left her. He claimed that Harvey had previously attempted to harm herself by ingesting "some stuff" and that he had revived her using a "bush remedy."

Linton told Mrs. Harvey that he saw Harvey the night of February 22, close to midnight, when he returned to the apartment, and again the next morning before he left the Cambridge apartment for North Carolina at 10:00 a.m. He said Harvey "murmured

---

[2] Although the district court stated that Linton arrived in North Carolina "[i]n the early morning of February 24," the SJC found only that Linton arrived at some point on February 24: The SJC recounted Linton's "shifting" timelines for his trip to North Carolina, then added that the defendant had applied for a job in North Carolina that day.

something" when Linton spoke to her as he was leaving. Shortly thereafter, however, Linton told Mr. Harvey that he did not see Harvey on February 23 as she had "gone to the grocery store" before he woke at 8:00 a.m. and had not returned by the time he left for North Carolina at 10:00 a.m. Mrs. Harvey pointed out the contradiction and asked Linton if he had harmed Harvey; he denied doing so.

As a result of Linton's phone call, Mr. and Mrs. Harvey went to the Cambridge apartment. The front door was locked, but they were able to gain access with keys from the rental agent. At or around 2:00 p.m., Mr. and Mrs. Harvey discovered their daughter's body on a sheet on the floor of the apartment, her cell phone and a cup of water next to her. Harvey, who was stiff as a result of rigor mortis, was lying "somewhat on her side," in "something like a 'fetal' position," dressed in sweats and wrapped to the neck in blankets. The sheet and carpet were stained with body fluids. The temperature in the apartment was set to eighty-five degrees. Mr. Harvey called 911 from his cell phone; a Cambridge police officer arrived minutes later. Police found no evidence of forced entry through the front door and no means of entry through the back door, which was blocked.

On February 25, state police spoke with Linton by phone. He told the trooper with whom he spoke that on the evening of

February 22 he had argued with Harvey in a phone conversation about money and some items he had taken from her. Linton claimed Harvey was asleep when he came home that evening and that he did not see her the next day before leaving for Florida at 12:00 p.m. to visit an aunt. He admitted he had not made plans with his aunt and was unable to offer any details about her or where in Florida she was living. Linton stated that Harvey had asked him to leave, that he locked the apartment, and that he had his keys. He also gave the trooper the first of several conflicting stories about how he got to North Carolina.[3]

On February 26, Linton telephoned a friend of Harvey's and told her that he and Harvey "got into a fight, and things went bad, and I left." He also called Carter and made plans to see her later in the day without mentioning his whereabouts. Linton was arrested that evening when he went to work at Wal-Mart. He waived his Miranda rights, and, during a two-hour interview with police, denied harming Harvey and claimed a former boyfriend may have killed her. He admitted that his relationship with Harvey had "problems," that they argued over bills, and that he had once had a physical fight with Harvey during which he "grabbed [Harvey] by

---

[3] Linton called the trooper the next day to give a second version of his travel, then reaffirmed his original account when confronted with an inconsistency.

the back of the neck."  The next day, Linton called Carter, telling her that Harvey was dead and that he had been jailed but was not responsible.  Carter did not hear from Linton again until months later, when he called to "t[ell] her not to go to court because if she [testified] he would go to jail for the rest of his life."

## A.  Proceedings in the Massachusetts Superior Court

The Commonwealth of Massachusetts proceeded against Linton in Superior Court under two first-degree murder theories: "deliberate premeditation and extreme atrocity or cruelty."  The Commonwealth's medical examiner, Dr. Richard Evans ("Dr. Evans"), testified that Harvey died as a result of manual strangulation.  He noted "multiple abrasions to the right side of the victim's neck below her jaw, consistent with fingernail marks, and a larger bruise on the left side of the victim's rib cage that . . . could have been caused by the force of a knee on the victim's chest."  The abrasions were inflicted while Harvey was still alive.  Dr. Evans also testified that the force applied to Harvey's neck "was so strong that it had caused a separation of the hyoid bone . . . at the base of the victim's tongue, under the jaw" and the resulting circulatory pressure was so intense that it caused "extensive bleeding in [her] eyes."  While struggling to breathe, he testified, Harvey bit her tongue so hard that she left marks and drew blood.  Dr. Evans estimated that Harvey would have been

conscious for about ninety seconds of "constant or near-constant pressure."

Dr. Evans noted that determining time of death is an inexact science but estimated that Harvey died between "eight hours up to twenty-four hours, maybe even slightly beyond twenty-four hours" before police photographed her body on February 24, based on rigor mortis, decomposition, and lividity. He also testified that "while in normal circumstances it would have taken two to three days to reach the state in which the victim's body was discovered, . . . because of the high temperature in the apartment, that time had been cut '[r]oughly in half.'" A forensic DNA analyst testified that DNA testing of samples from Harvey's mouth, neck, and vagina did not reveal male DNA. Scrapings from under Harvey's fingernails yielded one partial male profile; Linton could not be excluded as the potential source.

At trial, Mr. Harvey testified about a September 2004 incident when his daughter called him, "very upset, pretty much hysterical," to "come over and get her." He stated that when he arrived at the Cambridge apartment ten minutes later, he found her outside at a payphone, "still hysterical" and "still crying." At her request, Mr. Harvey testified, he went up to the Cambridge apartment and asked Linton for her cell phone; Linton denied having the phone, so Mr. Harvey returned to his daughter and they left.

Mr. Harvey stated that Harvey was "still hysterical" in the car on the way to his home and that she told him she had fought with Linton and he had taken her cell phone, cut the landline connection, and choked her into unconsciousness when she tried to leave the apartment. No more than twenty minutes passed between Harvey's call to her father, which immediately followed the assault, and her statement.[4]

The jury convicted Linton on one count of first-degree murder on the theory of extreme atrocity or cruelty under Mass. Gen. Laws Ann. ch. 265, § 1. Linton, 924 N.E.2d at 727. Linton moved for a new trial; his motion was denied. Id. at 727-28.

**B. Proceedings in the Massachusetts Supreme Judicial Court**

Linton appealed to the SJC, challenging both the conviction and the order of the trial judge denying a new trial. Linton, 924 N.E.2d at 727. He argued "that the evidence presented at trial was insufficient to support the jury's verdict and that [the SJC] should reverse the [Superior Court's] denial of his motion for a required finding of not guilty." Id. In the

---

[4] Although the SJC concluded that "approximately twenty minutes . . . passed," this point is not perfectly clear from Mr. Harvey's trial testimony. Mr. Harvey testified that it took ten minutes to get to his daughter's apartment after she called. When asked how much time had passed "from when you went to get her to when she started to make this statement," Mr. Harvey replied, "Within the time it took me to get from picking her up and getting her home, so it would be within ten minutes."

alternative, Linton claimed a new trial was merited because the Superior Court erred by admitting the victim's statements about a previous assault in violation of his right to confront adverse witnesses.[5]  Id.

The SJC affirmed Linton's conviction and the order denying his motion for a new trial.[6]  Id. at 744.  The SJC applied the state law standard for a denial of a required finding with respect to the sufficiency of the evidence: "[W]hether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged."  Id. at 733 (quoting Commonwealth v. Lao, 824 N.E.2d 821, 829 (Mass. 2005)).  The SJC noted that the Massachusetts standard is consistent with that of Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).  Id. (citing Commonwealth v. Latimore, 393 N.E.2d 370, 374-75 (Mass. 1979)).  The court concluded that the jury reasonably could have found Linton killed Harvey based on the lack of forced entry and Linton's admission he locked the apartment

---

[5]  Linton also raised two issues not before this Court that are not relevant here.  Linton, 924 N.E.2d at 727.

[6]  The SJC addressed and dismissed two evidentiary issues not raised surrounding the videotape of Linton using an ATM and the admission of DNA evidence.  Id. at 742-44.

-11-

and kept his keys; evidence of his actions and movements on February 23 that "established a chronology . . . permitt[ing] the jury to conclude that [Linton] had . . . opportunity";[7] motive, given his marital difficulties and extramarital affair; the glass of water by Harvey's body, which could be meant to "leave the impression that the victim had died by suicide"; and the estimated time of death. Id. at 733-34. A reasonable jury, the SJC added, could also infer that Linton did not know where he would sleep the night of February 23, as he asked Carter if he could stay with her. Id.

Addressing Linton's related claim that the evidence was not sufficient to support a conviction of first-degree murder based on extreme atrocity or cruelty, the SJC noted that a jury must find one or more factors under Commonwealth v. Cunneen, 449 N.E.2d 658 (Mass. 1989), to sustain such a conviction. Linton, 924 N.E.2d at 734. As the SJC stated, the Cunneen factors are:

> (1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's physical injuries;

---

[7] In addition to discussing Linton's ATM withdrawal and call to Carter, the court cited to evidence that the last outgoing call from Harvey's phone was at 8:23 a.m. and there was an unanswered call to her phone at 10:15 a.m. on February 23; that a landline phone call was placed from the Cambridge apartment to Linton's mother's phone in Jamaica at 12:32 p.m. that day, which suggested he was at the apartment; and that a phone call was placed by Linton from the New York Port Authority. Id. at 733-34.

(4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon, instrument, or method used in the killing; and (7) the disproportion between the means needed to cause death and those employed.

Id. at 735 n.10 (citing Cunneen, 449 N.E.2d at 665). The SJC concluded that, based on Dr. Evans's testimony, a jury "reasonably could have found" multiple Cunneen factors, including: "indifference to the victim's suffering, the victim's high degree of conscious suffering, and the overwhelming force applied during the strangulation." Linton, 924 N.E.2d at 735.

In reviewing Linton's Confrontation Clause claim, the SJC relied on a two-step state standard it noted to be consistent with Crawford v. Washington, 541 U.S. 36 (2004), and Davis v. Washington, 547 U.S. 813 (2006), per Commonwealth v. Simon, 923 N.E.2d 59 (Mass. 2010): "[1] determin[ing] whether the statement is admissible under our common law of evidence . . . . [2] then determin[ing] whether admission of the statement is prohibited by the confrontation clause [sic] of the Sixth Amendment." Linton, 924 N.E.2d at 736 (quoting Commonwealth v. Nesbitt, 892 N.E.2d 299, 306 (Mass. 2008)). The SJC found that Harvey's statement about her attack to her father was admissible under the excited utterance hearsay exception given the nature of the physical attack, its effect on her, and the relatively short amount of time between the assault and her statement to Mr. Harvey. Id. at 736-

-13-

37. Further, the SJC found that the statement's admission did not violate the Confrontation Clause, as a "reasonable person . . . would not have anticipated that her statements to her father would be used against [Linton] when she did not report the crime to the police or the court" and nothing indicated the statement was made "for any other purpose than to explain to her father what had happened." Id. at 737.

## C. Proceedings in the District Court of Massachusetts

Linton timely filed a petition for a writ of habeas corpus. Linton, 2014 WL 4804746, at *3. He argued, inter alia, that (1) "[t]he admission at trial of statements made by the deceased victim to her father about a prior assault by [Linton] violated [Linton's] constitutional right to confront witnesses against him" and (2) "[t]he conviction was not supported by sufficient evidence and therefore violated [Linton's] constitutional right to due process."[8] Id. at *1. The district court denied habeas relief, id. at *11, holding that (1) Harvey's statement to her father about a prior assault by Linton was not testimonial and "the SJC's application of the Supreme Court's Confrontation Clause precedents was not unreasonable," id. at *6,

_____

[8]  Linton also made an ineffective assistance of counsel argument, which the district court rejected and to which it declined to grant a certificate of appealability. Linton, 2014 WL 4804746, at *3.

-14-

and (2) "the SJC did not unreasonably apply the Jackson standard when it dismissed [Linton]'s sufficiency of evidence claim . . . [n]or did the SJC unreasonably apply Jackson in finding sufficient evidence to support a conviction based on extreme atrocity or cruelty." Id. at *8. Linton filed a Notice of Appeal and motioned for a certificate of appealability. The district court granted a certificate of appealability with respect to these two claims only.

## II. The Habeas Framework

### A. Standard of Review

We review the district court's denial of habeas relief de novo. Sánchez v. Roden, 753 F.3d 279, 293 (1st Cir. 2014). "[D]e novo review encompasses the district court's own 'determination of the appropriate standard of review of the state court proceeding.'" Id. (quoting Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009)). The district court is not entitled to deference. Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006). Rather, in these cases, we must "determine whether the habeas petition should have been granted in the first instance." Sánchez, 753 F.3d at 293.

### B. Antiterrorism and Effective Death Penalty Act Standards

Under AEDPA, habeas relief

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

-15-

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013); Zuluaga, 585 F.3d at 29.

We have held that an adjudication is "'on the merits,' giving rise to deference under § 2254(d) of AEDPA, 'if there is a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" Yeboah-Sefah v. Ficco, 556 F.3d 53, 66 (1st Cir. 2009) (quoting Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007)). "[A] state-court adjudication of an issue framed in terms of state law is nonetheless entitled to deference under section 2254(d)(1) as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the defendant's rights as its federal counterpart." Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009).

## C. Clearly Established Federal Law

To determine whether a decision was contrary to Supreme Court precedent or constituted an unreasonable application of federal law under such precedent per § 2254(d), this Court "look[s]

-16-

to the Supreme Court's holdings, as opposed to dicta, at the time the state court rendered its decision."  Hensley v. Roden, 755 F.3d 724, 730-31 (1st Cir. 2014) (citing González–Fuentes v. Molina, 607 F.3d 864, 876 (1st Cir. 2010)); see Thaler v. Haynes, 559 U.S. 43, 47 (2010).  Federal habeas courts may not look to circuit precedent "refin[ing] or sharpen[ing] a general principle of Supreme Court jurisprudence into a specific rule that th[e] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013); see also López v. Smith, 135 S. Ct. 1, 4 (2014).  Nor may a federal habeas court "canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct."  Marshall, 133 S. Ct. at 1451.

**D. Contrary to or an Unreasonable Application of Clearly Established Federal Law**

A state court decision is "contrary to" clearly established federal law "if the state court '"applies a rule that contradicts the governing law set forth" by the Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."'"  Hensley, 755 F.3d at 731 (quoting Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000))).  And "a state court adjudication constitutes

-17-

an unreasonable application [of clearly established federal law] 'if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  Id. (quoting Abrante v. St. Amand, 595 F.3d 11, 15 (1st Cir. 2010)).

"For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Williams, 529 U.S. at 410).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision."  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Alvarado, 541 U.S. at 664.  Thus, to obtain federal habeas relief, a petitioner must show "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

-18-

### III.  **The Claims**

## A.  Sufficiency of the Evidence

### 1.  Applicable Law

The parties acknowledge that <u>Jackson</u> is the source of the clearly established federal law applicable to the sufficiency claim in the instant case.  Under <u>Jackson</u>, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319.  "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Id.</u> at 324 n.16.  A criminal conviction may be supported by circumstantial evidence alone.  <u>Id.</u> at 324-25; <u>see also</u> <u>Magraw</u> v. <u>Roden</u>, 743 F.3d 1, 6 (1st Cir. 2014) ("This principle [that direct evidence is not required to uphold a conviction] is even more firmly established in connection with the deferential approach to state-court decisionmaking that federal habeas review demands.").  "[A] federal habeas corpus court faced with a record . . . that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326.

A federal court reviewing a habeas petition raising a Jackson claim must apply a "twice-deferential standard." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was "objectively unreasonable."'" Id. (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011)). In this context, "'[b]eyond a reasonable doubt' does not require the exclusion of every other hypothesis; it is enough that all reasonable doubts are excluded." O'Laughlin, 568 F.3d at 301 (alteration in original) (quoting Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir. 1995)). Where any reasonable jurist would conclude that "evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," however, this Court must reverse because equipoise is tantamount to reasonable doubt. Id. (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)); cf. Magraw, 743 F.3d at 5 (emphasizing that "this equal-evidence rule takes hold only after we have drawn all reasonable inferences in favor of the verdict").

**2. Analysis**

As the SJC adjudicated the case on the merits, the district court correctly applied the highly deferential AEDPA standard. Zuluaga, 585 F.3d at 29. That the SJC applied Latimore

rather than Jackson does not diminish its claim to deference under AEDPA, Foxworth, 570 F.3d at 426, as "the Latimore test . . . is functionally identical to the Jackson . . . standard." Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015).

Proceeding accordingly, we find that Linton did not prove a "contrary to" or "unreasonable application" of clearly established federal law under Jackson and thus is not entitled to habeas relief under AEDPA. 28 U.S.C. § 2254(d).

The Commonwealth argues that Linton's insufficiency of evidence identity argument is waived because he did not raise it in his habeas petition. We note that while Linton did not raise this argument in the petition itself, he did raise it in the memorandum of law supporting his petition. However, we need not decide if raising an argument in the memorandum of law is sufficient to prevent waiver. Even assuming the insufficiency of identity argument has not been waived, it fails on the merits.

The SJC asked the Massachusetts version of "the relevant question" under Jackson, and evaluated all available evidence to find support for identity, opportunity, motive, and consciousness of guilt. The abundance of evidence defeats Linton's efforts to compare this case to Commonwealth v. Salemme, 481 N.E.2d 471 (Mass. 1985), in which the SJC stated that "a defendant may not be convicted solely on the basis of consciousness of guilt," id. at

-21-

476, and O'Laughlin, where this Court reversed the district court's denial of habeas relief because "there was no physical or forensic evidence linking [the petitioner] to the crime scene; [the purported] motive was inconsistent with the evidence . . . ; and [the petitioner] presented compelling third-party evidence that [a third party] was the actual assailant." 568 F.3d at 308. Here, by contrast, ample evidence ties Linton to the crime, shows motive, and indicates consciousness of guilt. For example, the apartment in which Harvey was found was locked -- with no sign of forced entry -- and Linton had keys to the apartment. Linton was with Harvey the morning of the day the murder most likely occurred, February 23, and a jury could have inferred that he was in the apartment even later, after Harvey ceased answering calls to or making calls from her cell phone and within the extended window for time of death Dr. Evans estimated, based on a call made to his mother at 12:32 p.m. and a video showing him at an ATM a ten-minute walk away from the apartment at 1:30 p.m. that day. Days after the murder, Linton told one of Harvey's friends that he and Harvey "got into a fight, and things went bad, and I left." The murder also appeared to have been staged to suggest Harvey killed herself by ingesting something; Linton had told Carter as well as Harvey's parents that he was concerned Harvey would hurt herself. The alternative explanation -- that an unknown person, or the ex-

boyfriend to whom he alluded during questioning on February 26, entered the apartment after Linton left, killed Harvey, and then locked the apartment was entirely improbable.

What is more, Linton simply did not present "compelling third-party evidence."  This case more closely resembles Magraw, in which this Court declined to grant habeas because, "after . . . draw[ing] all reasonable inferences in favor of the verdict," "the evidence [could not] fairly be said to be in equipoise."  743 F.3d at 5.  The circumstantial evidence Linton musters in support of his innocence, a timeline he claims supports the conclusion that he was out of state when Harvey died, is subject to conflicting inferences that must be resolved in favor of the jury verdict. Jackson, 443 U.S. at 326.

The SJC also reasonably applied Jackson in determining that the evidence was sufficient to support the "extreme atrocity or cruelty" element necessary to convict Linton of first-degree murder, Linton, 924 N.E.2d at 734-35, in Massachusetts.  Mass. Gen. Laws Ann. ch. 265, § 1.  The jury heard Dr. Evans's testimony as to the killing force inflicted on Harvey, the resulting devastating injuries, and her likely period of consciousness as that overwhelming force was applied and those injuries inflicted on her.  Supra at 9-10.  Contrary to what Linton claims, this evidence could reasonably be seen as sufficient to distinguish

-23-

this murder as exhibiting extreme atrocity or cruelty under Cunneen. 449 N.E.2d at 665.

For these reasons, based on these facts, and in light of the double deference to which the SJC in entitled under AEDPA and Jackson, Parker, 132 S. Ct. at 2152; Cavazos, 132 S. Ct. at 4, we affirm the district court's ruling as to the sufficiency of the evidence.

## B. Confrontation of Witnesses

### 1. Applicable Law

The parties correctly concur that Crawford sets forth the relevant clearly established federal law regarding Linton's Confrontation Clause claim. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI, and, per Crawford, bars the admission of "testimonial statements of witnesses absent from trial" unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. at 59. The Crawford Court listed "[v]arious formulations of this core class of 'testimonial' statements," including (1) "ex parte in-court testimony or its functional equivalent," 541 U.S. at 51, (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior

-24-

testimony, or confessions," id. at 51-52 (quoting White v. Illinois, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment)), and, relevant here, (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52. The Confrontation Clause "applies only to testimonial hearsay." Davis, 547 U.S. at 823.[9]

## 2. Analysis

As with Linton's Jackson claim, because the SJC adjudicated the case on the merits, we find the district court correctly applied the highly deferential AEDPA standard. Zuluaga, 585 F.3d at 29. And, as above, that the SJC applied this precedent through the state standard does not diminish its claim to deference under AEDPA, as the standard it applied here mirrors Crawford and Davis. Foxworth, 570 F.3d at 426.

We find that Linton failed to prove a "contrary to" or unreasonable application of clearly established federal law under

---

[9] A number of Supreme Court rulings after the state court ruling clarified "testimonial" but cannot be considered here per Hensley. 755 F.3d at 730-31. See Ohio v. Clark, 135 S. Ct. 2173, 2182 (2015) ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."); Williams v. Illinois, 132 S. Ct. 2221 (2012) (plurality opinion); Michigan v. Bryant, 562 U.S. 344 (2011); Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011).

Crawford or Davis and thus is not entitled to habeas relief under AEDPA on this ground either. 28 U.S.C. § 2254(d).

Linton argued that the SJC's paraphrasing of Crawford's "would be available for use" -- that court phrased it as "would be used" instead -- meaningfully changed its Crawford analysis.[10] His argument fails. The SJC acknowledged Crawford's guidance as to "testimonial" as well as the "primary purpose" test first introduced in Davis. Linton, 924 N.E.2d at 736-38. That court conducted a thoughtful review of the circumstances surrounding the statement and evaluated Harvey's possible primary purpose in making the statement to determine it was non-testimonial, as required. Id. at 549-51. Moreover, the SJC is entitled to special "leeway" in this determination, as it was applying a rule that was neither fully defined in its meaning nor exhaustive in its scope. Alvarado, 541 U.S. at 664; see Crawford, 541 U.S. at 68 ("We leave for another day any effort to spell out a

_____

[10] We also find that Linton did not, as the Government contends, waive his claim as to the SJC's phrasing of the Crawford test. Linton raised a Confrontation Clause argument in his habeas petition that included closely related reasoning. See Logan, 790 F.3d at 70. Thus, his test-phrasing argument did not constitute an "independent ground for relief," but developed an asserted ground for relief under the Confrontation Clause. See Companonio v. O'Brien, 672 F.3d 101, 112 n.10 (1st Cir. 2012). Moreover, his reasoning was not "perfunctory": it included an effort at "developed argumentation." See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

comprehensive definition of 'testimonial.'"); Davis, 547 U.S. at 822 (noting that the decision would not produce an "exhaustive classification"); see also United States v. Phoeun Lang, 672 F.3d 17, 22 (1st Cir. 2012). We agree it was reasonable to find Harvey's statement was not testimonial as, although she may no longer have been in immediate danger, she was discernibly and continuously upset from the time of the incident onward -- and speaking to her father, rather than law enforcement.

Even if the SJC's rephrasing and application of the Crawford language was incorrect, and even if we were to assume that that language could be read to be more definitive and exhaustive than the court itself claimed, it was not unreasonable. Hensley, 755 F.3d at 731. That this Court and other circuits have used language and analysis in line with that used by the SJC adds further force to the conclusion that the SJC's formulation is not one with which "fairminded jurists" could not agree. Richter, 562 U.S. at 88; see, e.g., Phoeun, 672 F.3d at 22; Blount v. Hardy, 337 Fed. Appx. 271, 276 (4th Cir. 2009); United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004).

## IV.  Conclusion

The SJC did not rule "contrary to" or unreasonably apply "clearly established Federal law."  Accordingly, we affirm the district court's denial of Linton's habeas corpus petition.

**Affirmed.**