# United States Court of Appeals
## For the First Circuit

No. 22-1666

DENNIS JORDAN,

Petitioner, Appellant,

v.

KENNETH LIZOTTE,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Montecalvo, Lipez, and Kayatta,
Circuit Judges.

Benjamin Brooks, with whom Good Schneider Cormier Fried & Brooks was on brief, for appellant.
Eva M. Badway, Assistant Attorney General of Massachusetts, Criminal Bureau, with whom Andrea Joy Campbell, Attorney General of Massachusetts, was on brief, for appellee.

June 5, 2026

**KAYATTA**, **Circuit Judge**.  Following a shooting at an after-hours club in 2002, a Massachusetts jury convicted Dennis Jordan of numerous offenses, including armed assault with intent to murder.  After the Massachusetts Appeals Court (MAC) affirmed his conviction and the Massachusetts Supreme Judicial Court declined further review, Jordan sought a writ of habeas corpus from the district court, which denied his petition.  On appeal, he argues habeas relief is warranted due to alleged errors by his trial counsel, the trial court, and the prosecution.  For the reasons that follow, we agree with the district court that Jordan's petition does not meet the stringent standard for habeas relief under the Antiterrorism and Effective Death Penalty Act (AEDPA).

## I.

Under AEDPA, we presume that the facts found by the MAC[1] are supported by the record unless Jordan shows otherwise "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  We summarize those facts "supplemented with other facts from the record that are consistent with the MAC's findings." Hudson v. Kelly, 94 F.4th 195, 197 n.1 (1st Cir. 2024) (citation modified).

---

[1] Because Jordan sought but was denied further state appellate review by the Massachusetts Supreme Judicial Court, the MAC opinion is the "last reasoned [state court] decision" and is entitled to deference under AEDPA.  See Junta v. Thompson, 615 F.3d 67, 71, 73 (1st Cir. 2010) (quoting Malone v. Clarke, 536 F.3d 54, 63 n.6 (1st Cir. 2008)).

Arriving by private bus late on the night of September 13, 2002, Jordan and seven other men sought entry to an after-hours party in Brockton, Massachusetts. After a bouncer removed Jordan from the entry line, a violent altercation ensued in which shots were fired, striking three of the bouncers and paralyzing one from the waist down. In the wake of the gunfire, Jordan returned to the bus and banged on the door for entry while wielding a black handgun.[2] The bus driver, Jerial Wilson, who was already familiar with Jordan, let the group back onto the bus and drove away from the scene under Jordan's instruction.

Jordan was arrested less than a month later. After booking, he grew agitated and began swearing at one of the detectives, telling him, "[Y]ou ain't got nothing on me, you can't prove nothing," "[W]itnesses seem to not want to testify," and "[Y]ou ain't got the gun." Later that day, while denying involvement in the shooting, Jordan offered a description of the shooting, claimed he left the scene in a car with a woman named Star, and referred to "being able to find the guns used in the shooting."

When reciting the foregoing facts, the MAC stated that "[Jordan] . . . fired shots" during the altercation with the

---

[2] Jordan was not the only one observed with a gun; the MAC found that another member of the group was also armed. Jordan's briefing admits there was more than one shooter.

bouncers. We treat it as a given that the evidence presented in state court supports that factual determination, since Jordan does not argue that such a determination was unreasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Instead, he contends that the record might well have led the jury to conclude otherwise but for three errors: one by his own counsel in failing to seek a jury instruction on the specific subject of eyewitness identification; one by the trial judge in limiting the scope of cross-examination of the bus driver, Wilson, by Jordan's counsel; and one by the government in withholding evidence.[3] The relevant inquiry before us, then, is not whether the MAC's finding that Jordan was a gunman constituted a reasonable view of the evidence actually presented. Rather, as we will explain, our principal task as framed by Jordan's appeal is to determine whether any of these alleged errors "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." See 28 U.S.C. § 2254(d)(1).[4]

---

[3] Like his appeal in state court, Jordan's habeas petition also challenged the trial court's disposition of a motion to suppress, but he does not press that claim on appeal.

[4] Jordan does briefly claim that the MAC's decision was based on an unreasonable determination of the facts. But nowhere in his briefing to this court does he identify any specific factual finding that was belied by clear and convincing evidence. See 28 U.S.C. § 2254(d)(2), (e)(1).

## II.

On November 22, 2002, Jordan was indicted by a Massachusetts grand jury on three counts of armed assault with intent to murder, in violation of Mass. Gen. Laws ch. 265, § 18(b); three counts of assault and battery by means of a dangerous weapon, in violation of Mass. Gen. Laws ch. 265, § 15A(b); one count of unlawful possession of a firearm, in violation of Mass. Gen. Laws ch. 269, § 10(a); and one count of committing a firearms felony with three prior convictions for violent or drug offenses, in violation of Mass. Gen. Laws ch. 269, § 10G(c). Wilson, the bus driver, testified against Jordan before the grand jury; two years later, in 2004, Wilson began working as a federal informant.

In 2005, Jordan was convicted by a jury on all counts. When he appealed, however, several volumes of trial transcript could not be produced, so he was granted a new trial, which began in July 2013. Jordan was again convicted on all counts.

After unsuccessfully moving for a new trial, Jordan appealed to the MAC, which affirmed his conviction. He then sought and was denied further appellate review from the Massachusetts Supreme Judicial Court, before finally seeking habeas relief in the U.S. District Court for the District of Massachusetts, which

denied his petition.  Jordan now appeals that denial,[5] which we review de novo.  <u>Linton</u> v. <u>Saba</u>, 812 F.3d 112, 121 (1st Cir. 2016).

## III.

Jordan faces a daunting task in his quest for habeas relief.  For claims like his that have been adjudicated on the merits in state court, AEDPA precludes federal courts from issuing the writ unless the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Jordan's arguments focus on challenging the reasonableness of the state court's application of federal law.  This standard is intentionally

---

[5] The district court initially did not issue Jordan a certificate of appealability but granted him a window of time in which to move for one.  Within that window, and within 30 days of the court's final order denying his petition, Jordan filed a motion seeking additional time to move for a certificate of appealability. He then moved for such a certificate within the extended timeframe requested.  The district court granted his motion for an extension of time nunc pro tunc to the date when he moved for a certificate of appealability and then granted his motion seeking that certificate.  As a result, both Jordan's motion seeking a certificate of appealability and his actual notice of appeal were filed more than 30 days after the district court's final order. The parties agree, however, that Jordan's timely motion seeking an extension of time to move for a certificate of appealability functioned as a notice of appeal under <u>Cruzado</u> v. <u>Alves</u>, 89 F.4th 64, 74 (1st Cir. 2023), in that it evinced an intent to appeal and contained the information required under Federal Rule of Appellate Procedure 3(c).  Upon our own review, we agree and thus treat his appeal as timely.

- 6 -

difficult to meet, "reflect[ing] the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). To grant the writ under AEDPA's "unreasonable application" standard, a federal court must conclude that the state court's decision was "so lacking in justification" that there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. If any "fairminded jurist could reach the state court's conclusion under [the Supreme] Court's precedents," there can be no federal habeas relief. Brown v. Davenport, 596 U.S. 118, 135 (2022) (citation modified).

With this restrictive framework in mind, we turn to Jordan's claims.

**A.**

We begin with Jordan's ineffective assistance of counsel claim. He argues that, because his defense relied on a theory that one of the shooting victims, Nawarrior Lewis, misidentified Jordan as a shooter,[6] trial counsel's failure to request a jury instruction specifically addressing the subject of eyewitness

_____

[6] Lewis, who was not familiar with Jordan before the night of the shooting, identified Jordan as one of the gunmen at trial.

- 7 -

identification -- in particular the possibility of honest but mistaken identification -- amounted to constitutional error.

To show on direct review that counsel's performance was constitutionally infirm, a defendant must establish both that "counsel's representation fell below an objective standard of reasonableness" and that counsel's deficient performance "was prejudicial to the defense." Strickland v. Washington, 466 U.S. 668, 687–88, 692 (1984). Like the MAC and the district court, we train our consideration on Strickland's second prong, the required showing of prejudice. To demonstrate prejudice on direct review, a defendant must show that there is "a reasonable probability" -- meaning a "probability sufficient to undermine confidence in the outcome" -- that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. However, because this appeal arises on habeas review of a state court judgment, Jordan must do more than convince us that counsel's alleged error caused the requisite prejudice; he must show that no reasonable jurist could have concluded otherwise. See Harrington, 562 U.S. at 105.

The MAC determined that the absence of a more specific instruction on eyewitness identification testimony did not prejudice Jordan. It found that the instructions given were sufficient to alert the jury to the possibility that Lewis's identification may have been a good-faith error. Those

instructions directed the jury to consider, among other things, "the opportunity that the witness had to observe" the subject of their testimony and "the accuracy of the witness's memory." The MAC also held that some of the eyewitness identification-specific instructions Jordan alleges should have been given might have done more harm to Jordan's defense than good by highlighting the relative reliability of identifications based on witness arrays, which is one of the ways Lewis identified Jordan.[7] And the MAC noted the ample other evidence that tied Jordan to the crime, including testimony by multiple other witnesses -- some of whom were already familiar with Jordan -- placing him at the scene, and his own incriminating statements, including his expression of confidence that the police did not have the gun and that witnesses would "not want to testify" (as opposed to "would exonerate him"). The MAC concluded that an instruction on mistaken eyewitness identification would not have been likely to impact the verdict.

---

[7] The MAC focused most of its analysis on counsel's failure to request an instruction on honest-but-mistaken eyewitness identification, which Jordan refers to as a Pressley instruction. See Commonwealth v. Pressley, 457 N.E.2d 1119, 1120-21 (Mass. 1983). On appeal, Jordan emphasizes that his claim of error is broader: The trial court gave no instruction specifically on eyewitness identification at all. But the MAC reasonably addressed his broader claim as well by finding (as the trial court did on Jordan's motion for a new trial) that the other instructions sought, which derive from Commonwealth v. Rodriguez, 391 N.E.2d 889, 897 (Mass. 1979), may have hurt Jordan's case for the reason discussed above.

We see in this ruling no error cognizable under AEDPA. Eyewitness identification-specific jury instructions are one helpful safeguard against juror overreliance on such testimony. See Perry v. New Hampshire, 565 U.S. 228, 245-46 (2012). But the issue before us here is not whether such an instruction should have been sought or given. The issue is whether any fairminded jurist could have concluded, as the MAC did, that there was no reasonable probability the verdict would have been different if such an instruction had been given. See Harrington, 562 U.S. at 101. We think a fairminded jurist could have so concluded. As Jordan stresses in his brief, the most important part of the requested instruction would have been flagging the possibility that an honest witness might be mistaken. Jordan's cross-examination of Lewis effectively conveyed this same message, focusing on showing that Lewis did not know Jordan beforehand, that time had passed between the shooting and identification, that it was dark at the time of the shooting and things happened fast, and that Lewis's attention at the time may have been distracted -- points counsel then drew upon in closing. See Perry, 565 U.S. at 245-46 (listing cross-examination and closing arguments as other safeguards against undue jury reliance on eyewitness testimony). And of course, the relevance of counsel's cross-examination and closing argument was underscored in the instructions that were given, which directed jurors to consider

witnesses' opportunity to observe and the accuracy of their memories.

In addition to pointing out the paucity of daylight between the likely impact of the instruction given and that of the instruction Jordan now proffers, the MAC also reasonably found that Lewis's testimony was neither the only nor the most important evidence against Jordan. Most notably, the bus driver, Wilson, saw Jordan holding a gun immediately after the shooting, and Jordan made statements to the police that the MAC found were "either inconsistent with other witness testimony" or "inherently inculpatory." On appeal, Jordan attempts to minimize the import of this evidence as merely placing him on the scene, rather than implicating him as a shooter. But it was far from unreasonable for the MAC to conclude that Jordan's statements -- which suggested he would evade prosecution due to witnesses' reluctance to testify and implied that he knew the police did not have "the gun" -- point to a greater degree of culpability than simple presence on the scene, or to conclude that the inconsistency between Jordan's description of events and that of other witnesses tended to incriminate him.

Jordan argues that the MAC's prejudice conclusion was "poorly reasoned" in part because, in summarizing the other evidence against Jordan, the MAC did not mention that the only other eyewitness to the shooting itself did not notice Jordan

holding a gun shortly before the shooting.[8]  But he does not argue that the MAC's nonexhaustive account of the record rendered any factual finding unreasonable; instead, he attacks the MAC's application of the Strickland prejudice standard to that evidence. We thus interpret his claim as alleging that the MAC unreasonably applied clearly established federal law under 28 U.S.C. § 2254(d)(1) in finding a lack of prejudice, not that it unreasonably determined the facts underlying that finding under § 2254(d)(2).  See Williams v. Taylor, 529 U.S. 362, 367, 397-99, 407 (2000) (evaluating, under § 2254(d)(1), the state court's failure to mention or weigh certain evidence in its prejudice determination and stating that § 2254(d)(1)'s "unreasonable application" prong is met if the state court "identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case").

In light of the efforts by Jordan's counsel, the trial court's instruction to the jury to consider witnesses' opportunity to observe and the accuracy of their memory, and the weight of the other evidence against Jordan, we think there is at least a

_____

[8]  In his brief, Jordan claims this eyewitness, Clifton Lewis, saw him without a gun during the shooting.  But Clifton Lewis testified at trial that he had observed Jordan without a gun shortly before the shooting.  Because this trial testimony is consistent with the MAC's findings, we may consider it.  Hudson, 94 F.4th at 197 n.1.

- 12 -

reasonable argument that jury instructions more specific to eyewitness identification would have been unlikely to change the verdict. See Berghuis v. Thompkins, 560 U.S. 370, 390-91 (2010) (finding, on de novo review, that it was "not reasonably likely" an unrequested jury instruction would have altered the verdict given substantial other evidence of guilt and the court's instruction to the jury to assess witness credibility). We therefore hold that a reasonable jurist could agree with the MAC's conclusion that Jordan failed to show the prejudice required to sustain his claim of ineffective assistance of counsel under federal law.[9]

**B.**

We turn next to Jordan's claim regarding limitations on his cross-examination of the bus driver, Jerial Wilson. We first describe those limitations, then explain why they provide no basis for habeas relief.

**1.**

At Jordan's second trial in 2013, Wilson offered testimony consistent with his 2002 grand jury testimony.[10] He

---

[9] Although Jordan argues the MAC's analysis is at odds with a decision of the Massachusetts Supreme Judicial Court regarding jury instructions, that claim, even if true, is irrelevant to our limited federal habeas review of the state court's lack of prejudice finding.

[10] Jordan points out that when asked at the 2013 trial, Wilson testified about distinctive clothing Jordan wore on the night of the shooting, which tended to incriminate Jordan, and that Wilson

- 13 -

testified that there was a disagreement between the bouncers and a group that included Jordan, that he heard but did not directly witness gunfire, and that shortly after the shots Jordan banged on the bus door with a black gun in his hand and ordered him to open the door.

Prior to that second trial, the Commonwealth moved in limine to preclude Jordan from cross-examining Wilson about his federal informant activity (which began years after the shooting). The trial court allowed Jordan to cross-examine Wilson about his status as an informant -- including his close working relationship with law enforcement and the payments he received -- to show bias favoring the police, but barred inquiry into the particulars of the cases on which he worked. Jordan's counsel objected to this limitation, theorizing that Wilson may have targeted Jordan's "associates" in the lead-up to Jordan's first trial in 2005 to get them off the streets so they could not retaliate against Wilson for testifying against Jordan. In counsel's view, this alleged targeting would also show bias against Jordan. Counsel did not then explain why Wilson's supposed desire to protect himself from retaliation by Jordan's alleged friends would have encouraged Wilson to give false, inculpatory testimony against Jordan. The trial court overruled counsel's objection as too speculative.

_____

did not so testify before the grand jury. But Wilson was never asked about Jordan's clothing before the grand jury.

While discussing the scope of Wilson's cross-examination with the court and Jordan's counsel at trial, the Commonwealth produced documents relating to Wilson's payment as an informant that Jordan's counsel had not previously seen. While largely redacted, the documents named some individuals against whom Wilson had informed; Jordan's counsel claimed these were indeed Jordan's "associates." He renewed his objection to the limitation on cross-examination, arguing these documents somehow bore out his theory of bias, which the court again overruled.

On cross-examination, Wilson admitted that he worked as a federal informant and chose his own targets in that work. He testified that some of his choices were "based on an incident that took place with [his] brother" -- specifically, the October 2002 murder of his brother in Brockton -- that "made [Wilson] feel . . . to do the right thing." On the Commonwealth's motion, the trial court struck the portion of Wilson's testimony relating to his brother's death but otherwise allowed in the information that Wilson chose his own targets.[11]

---

[11] The Commonwealth moved to strike this testimony on the grounds that it involved Wilson's motivation to become an informant, which, per the court's earlier rulings, was irrelevant to his motivation to testify against Jordan. Defense counsel opposed the motion to strike without providing reasoning or argument. Wilson later testified that the same detective he spoke to about Jordan handled his brother's case; neither party moved to strike this testimony.

**2.**

With the foregoing in mind, we turn to Jordan's claim that, in limiting the scope of his cross-examination of Wilson, the trial court clearly violated his Sixth Amendment confrontation rights. This is so, he argues, because although he was able to demonstrate Wilson's general bias favoring police, he was unable to probe what he sees as Wilson's "personal" bias against Jordan, which he now asserts (as he did to the MAC) is connected in some way to the murder of Wilson's brother.

While "the partiality of a witness is subject to exploration at trial, and is always relevant to discrediting the witness and affecting the weight of his testimony," Davis v. Alaska, 415 U.S. 308, 316 (1974) (citation modified), cross-examination remains subject to a trial judge's "wide latitude to impose reasonable limits," including to avoid "confusion of the issues," United States v. Twomey, 806 F.2d 1136, 1139 (1st Cir. 1986); see also Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (noting the Sixth Amendment does not guarantee cross-examination "in whatever way, and to whatever extent, the defense might wish" (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985))). A limitation on cross-examination violates a defendant's Sixth Amendment right when "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility"

- 16 -

if counsel had "been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680.

The MAC held that the trial court acted within its discretion in limiting cross because Jordan's claim of bias was speculative. It concluded that, even assuming Wilson was biased against some of Jordan's associates, that bias, without more, did not support an inference that he was also biased against Jordan.[12]

As to Wilson's brother's death, the MAC understood Jordan's argument to be that Wilson was biased "on account of [Jordan's] alleged involvement in the murder of [Wilson's] brother." The MAC found that theory of bias rested on some kind of connection between the murder and Jordan (and/or his associates), and the record provided no such link. According to Jordan, the MAC's reasoning evinces a misunderstanding of his claim, since he "has never argued that [Jordan] or any of his friends were actually involved in Wilson's brother's murder, but rather that the murder provided Wilson with a personal reason for testifying against [] Jordan and later targeting his friends as a way of 'do[ing] the right thing,'" which was "potentially because, in Wilson's eyes, Jordan and his associates represented the same criminal element in Brockton that had led to his brother's demise."

---

[12] Indeed, Wilson specifically testified that the federal investigations he worked on did not relate to Jordan's case.

- 17 -

But we can hardly blame the MAC for understanding Jordan's claim as it did. In his briefing to the MAC, Jordan argued Wilson "chose to become an informant and pursued particular targets of his own choosing based on a personal reason related to his brother's murder," which he argued made it "reasonabl[e]" to "infer that Wilson was driven to provide exaggerated or fabricated information against [] Jordan because of the same personal reason." Jordan did not elaborate on what that "personal reason" was, nor did he speculate to the MAC, as he now does, that Wilson may simply have been biased against the entire "criminal element in Brockton" that Jordan represented to him.[13] Given this nonspecific argument to the MAC, it was not unreasonable for that court to interpret Jordan's claim of bias as alleging some "involvement" by Jordan and/or his friends in the murder. Nor does this alleged misunderstanding undercut the MAC's ultimate determination that the record revealed no factual connection between the death of Wilson's brother and Jordan (and/or his associates), whether

_____

[13] Jordan's counsel did previously, when moving for a new trial in the trial court, speculate to a variety of reasons Wilson may have been biased against Jordan that related to his brother's death. Those theories ranged from "maybe not because [Wilson] suspected that [Jordan and his friends] had killed [Wilson's] brother," but perhaps because they knew but refused to tell Wilson who did, or maybe Wilson was tired of the "code of silence" Jordan represented to him, or simply held Jordan and his associates responsible for "violence in [Brockton in] general." But Jordan did not attempt to focus on the specific theory of bias he now asserts, nor did he present this list of theories in his briefing to the MAC.

through direct involvement in the murder, knowledge of but refusal to disclose the culprit (as suggested by Jordan's counsel to the trial court), or some other unarticulated link.

Jordan has thus not convinced us that the MAC's decision not to reverse the trial court's evidentiary ruling is contrary to or an unreasonable application of clearly established federal law. The MAC reasonably could have concluded that the train of inferences Jordan sought to pursue would have led nowhere. After all, Wilson's relevant conduct as an informant was apparently all above board: All three of the associates to whom Jordan points on appeal pled guilty, and the government hardly concedes that Wilson did anything in those cases other than act as any fair informant would have acted, nor does Jordan allege that Wilson provided any false testimony in those cases. So Jordan's belief that Wilson acting similarly in his case was somehow improper is indeed based on speculation. See Twomey, 806 F.2d at 1139-40 (affirming the trial court's refusal to permit cross-examination of a witness regarding his alleged involvement in two murders given the lack of evidence linking the witness to the murders or supporting the theory of bias presented).

A fairminded jurist could therefore easily conclude that, even if Jordan had been granted his desired line of inquiry, a reasonable jury would not have been left with a "significantly different" impression of Wilson's credibility, Van Arsdall, 475

U.S. at 680, given the jury's ample exposure to Wilson's potential pro-law enforcement bias and Jordan's highly speculative -- and shifting -- basis for further inquiry.

We therefore find that the trial court's limitation on the scope of cross-examination sought by Jordan does not warrant habeas relief.

## C.

We turn finally to Jordan's claim that, by not disclosing documents that named some of Wilson's targets until mid-trial, the Commonwealth withheld exculpatory evidence in violation of Jordan's right to due process.

## 1.

Prior to his first trial, Jordan sought discovery about Wilson's work as a federal informant from Commonwealth prosecutors. The Commonwealth disclosed copies of various payments to Wilson and stated it had nothing further. In the lead up to his second trial in 2013, Jordan sought further discovery, including the specific cases on which Wilson worked. The Commonwealth agreed to seek such information and provide it to Jordan. When the Commonwealth subsequently provided no further information by the time of trial, Jordan moved to exclude Wilson's testimony or alternatively to voir dire him on the grounds that the Commonwealth had withheld exculpatory evidence. The trial court denied Jordan's motions.

During the trial, the Commonwealth presented Jordan's counsel with records relating to Wilson's informant work that contained the unredacted names of some of Wilson's targets; Jordan's counsel had not previously seen those records. After Jordan's 2013 conviction, Jordan's counsel uncovered sentencing memoranda for three of the individuals identified in those records. Those memoranda, in Jordan's view, showed Wilson "aggressively pursued" those individuals -- each of whom was associated, closely or loosely, with Jordan -- until they agreed to engage in illegal acts. Jordan moved for a new trial, based in part on the Commonwealth's failure to disclose those names before trial, and included the sentencing memoranda as exhibits. He argued the identities of the people Wilson informed against and the lengths to which he went to do so was exculpatory information because it suggested Wilson was biased against those individuals -- and, since those individuals were connected to Jordan, also suggested Wilson was biased against Jordan. At a hearing on the motion, he further speculated that Wilson may have blamed Jordan and/or his friends for his brother's murder for any number of reasons. See supra note 13.

The trial court denied Jordan's motion for a new trial, finding the information was not exculpatory because it provided no reasonable basis to infer Wilson was biased against Jordan, and that its late disclosure had not prejudiced him because the court

- 21 -

had properly excluded the details of Wilson's federal investigations. Jordan conceded below that, based on this order, the trial court would not have admitted these additional details of Wilson's informant activity even if he had known them at the time of trial.

## 2.

Jordan argues that the late disclosure of the names of Wilson's targets prevented him from developing his claim that Wilson was biased and points to the sentencing memoranda as the material he would have used to further develop that claim. Jordan claims those memoranda show Wilson's "personal reason" for targeting those individuals and "personal motivations" against them, but Jordan does not identify where any such reason or motivation is articulated in the memoranda. And our own review of those memoranda does not reveal any disclosure of Wilson's reasons for targeting the individuals to whom they pertain nor any mention of Jordan or any perjury or other unlawful conduct by Wilson. At most they show Wilson was a dogged informant who sought out his targets and placed considerable pressure on them to procure weapons and drugs.

Under Brady v. Maryland, 373 U.S. 83 (1963), the prosecution must disclose exculpatory and impeachment evidence in its possession to the defendant. United States v. Bagley, 473 U.S. 667, 669, 676 (1985). When the prosecution fails to do so,

- 22 -

"a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," meaning there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 678, 682. The MAC held that Jordan did not meet this standard for prejudice because, even with the late-disclosed evidence in hand, his theory of Wilson's bias "remain[ed] premised on a missing link" and he was "unable to establish a logical inference" that Wilson was motivated to lie on the stand.

Whatever the merits of Jordan's claim on direct review, we cannot say that the MAC's conclusion is so unreasonable as to warrant habeas relief. That conclusion is bolstered by the trial court's determination, in response to Jordan's motion for a new trial, that even after having received the sentencing memoranda it still would not have permitted the details of Wilson's informant activity to come into evidence. And even considering all the information contained in those memoranda, Wilson's conduct as an informant remains tangentially relevant at best to his testimony in Jordan's case. Jordan simply has not shown that no reasonable jurist could find, as the MAC did, that even with that information in his arsenal earlier, Jordan would have remained unable to

present a claim of bias sound enough to require the trial court to permit inquiry into that claim on cross-examination.

## IV.

For the foregoing reasons, we <u>affirm</u> the district court's denial of Jordan's petition for habeas relief.